# United States Tax Court

T.C. Memo. 2024-25

OCONEE LANDING PROPERTY, LLC, OCONEE LANDING
INVESTORS, LLC, TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 11814-19.                    Filed February 21, 2024.

————

*Kip D. Nelson, Elizabeth K. Blickley, Vivian D. Hoard, Richard A. Coughlin*, and *Brian C. Bernhardt*, for petitioner.

*Shannon E. Craft, Hilary E. March, Laurie A. Humphreys, Scheherazade R. Ferrand, James G. Hartford*, and *Benjamin H. Weaver*, for respondent.

## Table of Contents

MEMORANDUM FINDINGS OF FACT AND OPINION ...................... 3

FINDINGS OF FACT ...........................................................................4

I.   Introduction…...................................................................................4

II.  The Reynolds Family…....................................................................7

III. Reynolds Plantation…………………………… ........…………………7

IV.  The Parent Tract…………………………… ...........………………….9

V.   Development Proposals for the Parent Tract…………........ ……...10

VI.  Appraisals of the Parent Tract During 2011–2014… ….......…….…12

VII. Unsuccessful Efforts to Sell the Parent Tract………..........……. 14

**Served 02/21/24**

[*2]

VIII. Investigating a Conservation Easement………..............................17

IX.     Completing Phase 1………………………........ .......................20

X.      Formation of the Entities……………………………….............21

XI.     The Appraisals and PPMs…………………........................24

XII.    Year-End 2015 Transactions……………………......…...............27

XIII.   Final Appraisals…………………………… ........................29

XIV.    Tax Returns……………… ......…………….........................29

XV.     IRS Examination…………………........................................31

XVI.    Trial……………………………………................ ........31

        A.      Petitioner's Experts…………………............................31
                1.      Belinda Sward…………………...........................31
                2.      Rick McAllister………………............................32
                3.      George Galphin, Jr……………............................32
                4.      James Clanton…………………..........................33
        B.      Respondent's Valuation Expert…………….................34

OPINION…………………………………........................... 35

I.      Charitable Contribution Deduction…………..........................35
        A.      Donative Intent…………………………...................37
        B.      "Qualified Appraiser" Requirement……………............39
        C.      Application of Section 170(e)(1)……………................47
                1.      General Rules……………………….......................47
                2.      Tax Character of the Subject Property…………….49
                3.      Basis Limitation Under Section 170(e)(1)…….....56

II.     Valuation…………………………………........................57
        A.      Valuation Principles…………………………............58

**[\*3]**   B.      Highest and Best Use……………………………………59

C.      "Before Value" of the Subject Property………………66

1.      Sales Comparison Methodology………………66

2.      Respondent's Expert…………………………67

3.      Petitioner's Experts…………………………72

D.      Valuation of the Easement…………………………74

III.  Penalties………………………………………............…………74

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*: This is a syndicated conservation easement case.  The Internal Revenue Service (IRS or respondent) disallowed a charitable contribution deduction of $20.67 million claimed by Oconee Landing Property, LLC (Oconee), on its partnership return for the tax period ending December 31, 2015.[1]  Oconee claimed this deduction for donating a conservation easement over a tract of land in Greene County, Georgia.  The claimed deduction was premised on the assertion that the tract was worth $59,718 per acre before the granting of the easement.

We tried the case in Atlanta from November 14 through 22, 2022. The questions we must decide are (1) whether the charitable contribution deduction should be disallowed in its entirety because Oconee lacked the requisite charitable intent or because it failed to attach to its return a "qualified appraisal" as required by section 170(f)(11)(D); (2) whether any allowable deduction is limited to Oconee's basis under section 170(e)(1) because the property on which the easement was granted was "ordinary income property" in Oconee's hands; (3) whether (in the alternative) any allowable deduction is limited to $4,972,002, the fair market value (FMV) of the easement as determined by respondent; and (4) whether Oconee is subject to a 40% penalty for a  gross valuation

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure.  We round most amounts to the nearest dollar.

[*4] misstatement under section 6662(h) or (in the alternative) to a 20% penalty under other provisions of sections 6662 and 6662A.

We hold that Oconee is entitled to a charitable contribution deduction of zero for 2015, for two independently sufficient reasons. First, it failed to secure and attach to its return a "qualified appraisal" of the contributed property. *See* § 170(f)(11)(D). Second, the property on which the easement was granted was "ordinary income property" in Oconee's hands, so that any charitable contribution deduction would be limited to its basis. *See* § 170(e)(1). Because Oconee failed to prove that its basis exceeded zero, its contribution is limited to zero.

With regard to penalties, we find that the FMV of the easement was less than $5 million. Because the value claimed on Oconee's return exceeded the FMV of the easement by more than 400%, it is liable for the 40% gross valuation misstatement penalty. *See* § 6662(a), (h). Finally, we hold that Oconee is liable for a 20% penalty on the portion of the underpayment not attributable to the valuation misstatement.

## FINDINGS OF FACT

The following facts are derived from the pleadings, seven Stipulations of Facts with attached Exhibits, and the testimony of fact and expert witnesses admitted into evidence at trial. Oconee is a Georgia limited liability company (LLC) classified as a TEFRA partnership[2] for its short taxable period beginning December 24, 2015, and ending December 31, 2015. Petitioner Oconee Landing Investors, LLC (Oconee Investors or petitioner), is its tax matters partner. Both entities had their principal places of business in Georgia when the Petition was timely filed.

I. *Introduction*

The land on which the easement was granted (Subject Property) is in Greene County, Georgia, roughly 70 miles east/southeast of downtown Atlanta and not far from the South Carolina border. It is a relatively rural county with an estimated population of about 16,000 in 2015. In recent decades it has become a vacation and retirement

---

[2] Before its repeal, the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. No. 97-248, §§ 401–407, 96 Stat. 324, 648–71, governed the tax treatment and audit procedures for many partnerships, including Oconee.

[*5] destination owing chiefly to Lake Oconee, which lies on the county's southwestern border.

Lake Oconee was created in 1979 when Georgia Power Co., needing a reservoir for a hydroelectric plant, completed the Wallace Dam on the Oconee River. It is a large lake that extends its tentacles into innumerable creeks and valleys, yielding 374 miles of shoreline running through Greene, Morgan, and Putnam Counties. Much of the development since 1979 has focused on lakefront property and golf courses.

The Subject Property, comprising roughly 355 acres, was part of a 1,130-acre tract acquired in 2003 by James M. Reynolds III (Jamie) and Reynolds Partners, L.P., controlled by Mercer Reynolds (Mercer). Mercer and Jamie are third cousins; we will refer to them as the Reynoldses. We will refer to that larger property, which has varied in size over time, as the Parent Tract.

The Parent Tract is situated to the south of Interstate Highway 20 (I–20), the primary travel route to Atlanta and its suburbs. The Parent Tract is bounded on its eastern side by Georgia State Route 44 (Highway 44 or SR 44), a 94-mile-long highway that runs northeast-to-southwest through Greene County and neighboring counties. Carey Station Road, the most important local thoroughfare, runs north-south through the Parent Tract. The map below, dated April 2006, shows how the Parent Tract (a portion of the "Proposed Project Area" shown on the map) is situated vis-à-vis Lake Oconee and the roadways mentioned above:

[*6]



Members of the Reynolds family have been prominent landowners and developers in Greene County for more than three generations. They are admired for the good things they have brought to the county in terms of development and increased prosperity. Many of the fact witnesses who testified at trial are current or former employees or business associates of the Reynoldses. In some cases the Court perceived that these witnesses' loyalty and gratitude to the Reynolds family affected their testimony, and we have made certain credibility determinations accordingly.

The Reynoldses and their associates created dozens of distinct entities to conduct their real estate activities—holding companies, investment companies, development companies, and construction companies. Where important to the analysis, we will identify these entities individually. But to avoid undue complexity, we will sometimes refer to actions

[*7] taken by entities that Mercer and Jamie controlled as being taken simply by "the Reynoldses."

II.   *The Reynolds Family*

From 2003 through 2015 Mercer and Jamie were the individuals with ultimate management authority over the Parent Tract, including the Subject Property.  Both were sophisticated real estate developers with extensive knowledge about market conditions in Greene County.

After receiving degrees in business administration Mercer founded Reynolds, DeWitt & Co., an investment firm.  Much of his career has been devoted to real estate development.  In that capacity he gained familiarity with financial projections, discounted cashflow analyses, and private placement memoranda (PPMs).  Jamie graduated from the University of Georgia with a business degree in 1974.  He was the co-founder and managing member of American Real Estate Investment Co., which engaged in real property development and the acquisition and sale of timber properties.

In June 1993 Reynolds Partners, L.P. (Reynolds Partners), was formed to acquire, develop, lease, and manage real property.  It later made other investments, including baseball franchises, fast-food restaurants, and private equity.  From 2003 through 2015 Mercer served as its general partner (through an intervening wholly owned entity) and held a 5% partnership interest.  The remaining 95% of Reynolds Partners was divided among Mercer's five children.  At all relevant times Mercer controlled Reynolds Partners.

III.   *Reynolds Plantation*

Neither the Parent Tract nor the Subject Property has any access to Lake Oconee.  They are surrounded on three sides by real estate that is more favorably situated.  Beginning in the 1980s and operating through a joint venture called Linger Longer Development Co. (Linger Longer), Mercer and Jamie initiated the development of that more favorably situated acreage. The development was initially called Reynolds Plantation (now Reynolds Lake Oconee).

Built on timberland originally owned by Mercer's grandfather, Reynolds Plantation was a gated residential community with dozens of miles of shoreline on Lake Oconee, five golf courses, and thousands of homes, many on lakefront lots. The development eventually grew to include other residential communities (Great Waters and Reynolds

[*8] Landing), a Ritz Carlton hotel, several marinas, a health club, and 40–50 miles of roadways. The map below, dated October 2007, shows how the Parent Tract (located at the top of the map and referenced as "Reynoldsboro") is situated in relation to Reynolds Plantation:



Reynolds Plantation, with more than 6,000 acres under its control, was in the business of developing and selling residential (and some commercial) tracts. Homesites were developed incrementally, with 500 units (including new lots and existing homes) being sold in a typical year. As of 2010 Reynolds Plantation held several thousand acres that remained available for development.

The Great Recession was unkind to real estate developers in the Southeast United States, and the Reynoldses were no exception. By 2011 property sales at Reynolds Plantation had declined from 500 units annually to near zero. Encumbered by too much debt, Reynolds Plantation was forced into receivership. The Metropolitan Life Insurance Co. (MetLife) purchased Reynolds Plantation out of receivership; MetLife

[*9] thereby acquired not only the developed properties but also thousands of acres of undeveloped land. After the acquisition, MetLife cautiously resumed development of Reynolds Plantation, selling lots for homesites as the market began a very slow recovery.

The property that MetLife acquired out of receivership included five parcels comprising 1,392 acres that are adjacent to the Parent Tract and to the immediate west, south, and east of the Subject Property. One of these parcels has been zoned Commercial Planned Unit Development (CPUD), and the other four have been zoned Planned Unit Development (PUD), since at least 2015. The five parcels all have lake frontage, frontage along Highway 44, or both.

No legal or physical impediments prevented MetLife from developing these five parcels. But MetLife initiated no development of these parcels between 2012 and 2022, believing that other portions of Reynolds Plantation, more distant from the Subject Property, held greater development potential. All in all, MetLife had between 4,000 and 5,000 acres, including lakefront lots, available for residential development at year-end 2015.

IV.  *The Parent Tract*

In 2003 the Parent Tract consisted of 1,130 acres situated north/northwest of Reynolds Plantation. The Parent Tract is bisected by Carey Station Road; for that reason it was often called the "Carey Station Tract." In November 2003 Jamie and Reynolds Partners each acquired a 50% interest in the Parent Tract. Because Reynolds Partners was owned by Mercer's family and controlled by him, he and Jamie were ultimately responsible for all decisions regarding the Parent Tract.

Mercer and Jamie commissioned maps and surveys of the Parent Tract and considered various options for developing it. They eventually settled on a conceptual mixed-use development plan for a community to be called Reynoldsboro, consisting of one or more "town centers" surrounded by homes. In 2006 they submitted a proposed development plan to Greene County, identifying a mixture of high-density residential, low-density residential, commercial, and recreational uses. The county approved the plan and zoned the entire Parent Tract (including the Subject Property) as CPUD. This zoning category requires at least 25% residential and 25% nonresidential usage. The Parent Tract (including the Subject Property) retained CPUD zoning through 2015.

[*10] In 2006 the Reynoldses initiated efforts to have a new interchange constructed at the intersection of I–20 and Carey Station Road. The proposed interchange would have been closer to Atlanta than the existing interchange at the intersection of I–20 and Highway 44 (situated ten miles further east). Mercer believed that construction of the new interchange, by facilitating tourism and attracting home buyers from Atlanta, would have enhanced the development potential of the Parent Tract. Greene County strongly supported this concept, but the new interchange was never built.

By 2007 the Reynoldses had installed on portions of the Parent Tract paved and unpaved roads, wastewater and potable water access points, and utility access points. They continued their pattern, begun in 2003, of selling off small portions of the Parent Tract, generally with a view to facilitating amenities that would be synergistic with their hoped-for development. Between 2003 and 2014 the Reynoldses sold 11 parcels out of the Parent Tract, ranging from 0.43 acres to 25.71 acres, to be used (among other things) for the construction of a fire station, a church, a school (Lake Oconee Academy), a hospital (Good Samaritan), and a skilled nursing/assisted living facility. These parcels, all of which had good frontage on major roads, were sold at prices ranging from $15,947 to $67,136 per acre.

The Reynoldses also sold portions of the Parent Tract to other developers. In February 2007 they sold 17.6 acres, at $50,000 per acre, for inclusion in a planned residential community to be developed by Del E. Webb and Pulte Homes. The Del E. Webb development, which occupied 408 acres in toto, was adjacent to the Subject Property on its northwest side. Unlike the Subject Property, it had access to Lake Oconee and some lakefront lots. Construction of homes began in 2007–2008, but the full buildout took 15 years. The Del E. Webb community sold 31 new homes in 2015 and had numerous homesites available for sale at year-end 2015.

V.    *Development Proposals for the Parent Tract*

After Reynolds Plantation was lost to receivership in 2011, the Parent Tract was the most significant piece of real estate the Reynoldses continued to own in Greene County. During 2012–2015 their local development activities were thus focused on it.

During 2012–2013 Mike Kelly was the president of Reynolds Development Management Group, reporting to Mercer. He had specialized

[*11] knowledge of the real estate market in the Lake Oconee area; his responsibilities included pre-development work, rezoning, master planning, market studies, and feasibility analysis. He regularly prepared spreadsheets and discounted cashflow (DCF) analyses to test the feasibility of proposals for developing the Parent Tract.

In February 2013 Mr. Kelly prepared for Mercer a DCF analysis for the Parent Tract, which then comprised 1,038 acres. He projected that between 2012 and 2020 (1) a highly desirable 4-acre "corner lot" would sell for $250,000 per acre; (2) 61 acres suitable for commercial or institutional development would sell at prices ranging from $35,000 to $100,000 per acre; (3) 120 acres suitable for residential development would sell at prices ranging from $22,500 to $33,500 per acre; and (4) 100 acres suitable for recreation would sell for $25,000 per acre. In year 10 he projected that the remaining real estate (roughly 753 acres) could be sold at $12,500 per acre. He concluded that the net present value of the entire Parent Tract ranged from $1.78 million to $4.27 million, depending on various assumptions (including the discount rates used).

As Mr. Kelly's projections showed, the 1,038 acres then constituting the Parent Tract had vastly different values depending on where they were located. Lots with frontage on major roads, at intersections, and near existing communities were plausible candidates for future development. But 753 acres, constituting 73% of the Parent Tract, consisted of "inland" property lacking these desirable features. As a result, Mr. Kelly projected that these 753 acres would be worth only $12,500 per acre 10 years down the road. After offsetting commissions and other projected costs, Mr. Kelly anticipated the receipt of approximately $8 million in year 10. Using his median discount rate of 15%, the net present value of these 753 acres would be less than $2,650 per acre.

The Reynoldses began marketing the Parent Tract to potential investors, hoping to find a joint venture partner who would provide capital to begin development of "master infrastructure," including roads and sewer facilities. Using the projections prepared by Mr. Kelly and his colleague Scott Denbow, the Reynoldses created a marketing package for the Parent Tract. According to Mr. Denbow, this package "was to be selectively distributed to really a small group of potential investors" who were serious and financially well qualified.

In late 2012 Mercer and Mr. Kelly initiated negotiations with Robert Holbrook of Phoenix Atlanta Capital (Phoenix Capital). In

[*12] January 2013 Phoenix Capital sent the Reynoldses a letter of intent that valued the Parent Tract (then consisting of 1,016 acres) at $8.3 million, or about $8,170 per acre. The Reynoldses made a counteroffer in March 2013, but they were unable to reach a deal with Phoenix Capital.

Later in 2013 the Reynoldses made an offer to TPA Group (TPA), a highly regarded Atlanta developer, again seeking a joint venture partner to develop the Parent Tract. On this occasion the Reynoldses valued the Parent Tract at $7.9 million on the basis of a DCF analysis prepared by Messrs. Kelly and Denbow. Mercer approved this valuation and used it to market the Parent Tract to other potential investors during the third quarter of 2013.

TPA rejected the Reynoldses' offer. Messrs. Kelly and Denbow then revised their DCF analysis, arriving at a reduced value of $6.7 million, or roughly $6,700 per acre, for the Parent Tract. According to Mr. Denbow, $6.7 million "became the new asking price" for the Parent Tract. In September 2013 the Reynoldses offered the Parent Tract to TPA at this price, but TPA again rejected their offer.

VI.  *Appraisals of the Parent Tract During 2011–2014*

During 2011–2014 PNC Bank (PNC) held a multimillion-dollar loan secured by the Parent Tract. While this loan was outstanding, the Reynoldses needed a release from PNC before they could sell any portion of the property. Typically, the rationale for a release would be that selling part of the Parent Tract would make the remainder more marketable and valuable. If PNC granted a release and the parcel in question was sold, the proceeds were applied to reduce the PNC loan balance.

In April 2011 Coldwell Banker Richard Ellis Group, Inc. (CBRE), a commercial real estate firm, prepared at PNC's request an appraisal of the Parent Tract (then consisting of 1,049 acres). That appraisal valued the Parent Tract at $11 million, or roughly $10,500 per acre. This was a "market value" appraisal based on sales of comparable vacant land in Georgia, including agricultural properties.

The CBRE appraisal noted that residential development in the Lake Oconee area was "mostly oriented to vacation homes and this market has come to [a] relative standstill," with "[t]he weakened overall economy ha[ving] contributed to depressed levels of consumer spending." Because "[d]evelopment of new residential/mixed-use properties ha[d] been severely restricted" by these conditions, CBRE concluded

**[\*13]** that the highest and best use (HBU) of the Parent Tract would be "future mixed use development" to commence "when economic conditions improve."

CBRE observed that any development of the Parent Tract would have to compete with other proposed projects in the subject market, which were "slated to resume when economic conditions improve." "These factors indicate[d] that it would be financially feasible to complete a new mixed-use project when economic conditions improve," but only if "the site acquisition cost [for the Parent Tract] was low enough to provide an adequate developer's profit."

In June 2014 the Reynoldses sent a proposal to PNC requesting a release enabling them to sell portions of the Parent Tract. The letter expressed the Reynoldses' understanding that PNC would secure an appraisal and that this appraisal would be "delivered to Borrower upon request." CBRE likewise prepared this appraisal.

CBRE's appraisal, made as of June 29, 2014, valued the Parent Tract (then consisting of 1,025 acres) at $8,075,000, or about $7,900 per acre. This was a "fair market value" appraisal based on sales of comparable vacant land, including agricultural properties. Referring to the Parent Tract as "the subject," CBRE's appraisal stated as follows:

> The subject's area is marketed heavily to 2nd home buyers and regional retirees. This market segment was hit very hard by the financial downturn of 2008 and has yet to recover significantly. We anticipate that buyers of land, specifically large tracts of mixed-use and residential land (such as the subject) would be investors or developers well positioned to hold the property until the market recovers in the future to a level which warrants substantial additions in terms of housing supply.

CBRE concluded in its appraisal that "the highest and best use of the subject . . . would be the development of a mixed use property, time and circumstances warranting." In CBRE's view, the most likely buyer of the Parent Tract would be an investor or a developer. CBRE described a prospective investor as a "land speculator likely funded with mostly cash or by private equity." CBRE described a prospective developer as one "who would most likely hold for future mixed use development when the market recovers."

[*14] In early fall 2014 the Reynoldses (through intervening entities) formed Carey Station LLC and contributed to it roughly 980 acres of the Parent Tract. Carey Station LLC then sought a $3.25 million loan from Farmers Bank, intending to use the proceeds to pay off the PNC loan. The Farmers Bank loan, like the PNC loan, was to be secured by the Parent Tract.

Before extending credit, Farmers Bank hired Weibel & Associates (Weibel) to appraise the Parent Tract. Weibel's appraisal, prepared as of August 24, 2014, covered 964 acres of the Parent Tract and valued that acreage at $9.64 million, or roughly $10,000 per acre. This was a "market value" appraisal based on sales of comparable vacant land, including agricultural properties. Farmers Bank closed the $3.25 million loan in October 2014, and the loan was paid in full on December 29, 2015, with proceeds derived from the conservation easement transactions.

VII. *Unsuccessful Efforts to Sell the Parent Tract*

The Reynoldses actively marketed the Parent Tract during 2014 and early 2015. Seeking to enhance the prospects for a sale or joint venture, they commissioned a utility review and a master sewer plan from an engineering firm. They also prepared a conceptual land use plan showing proposed roadways, residential communities, and proposed commercial development.

During 2015 Rick McAllister, a landscape architect, created revised versions of this conceptual land use plan, which ultimately showed more than 3,000 residential units on the Parent Tract. This number of residential units could not have been absorbed by Greene County in the foreseeable future. Greene County issued only 203 new residential housing permits in 2014 and only 224 new residential housing permits in 2015. And besides the 3,000+ residential units shown on Mr. McAllister's plan for the Parent Tract, the existing communities near Lake Oconee—including Del E. Webb and Reynolds Lake Oconee—had thousands of acres available for residential development and were actively marketing their homesites.

The Reynoldses continued their negotiations with TPA into 2014. In February of that year TPA countered with an offer of $2.8 million for the entire Parent Tract, an offer the Reynoldses rejected. But while the parties could not reach an agreement on the Parent Tract as a whole, they did conclude a deal to develop part of it. In May 2014 the

**[\*15]** Reynoldses sold a 15.43-acre parcel to Carey Station Communities, a joint venture owned 50%/50% by entities controlled by TPA and the Reynoldses. They planned to develop the parcel into a residential subdivision called Traditions at Carey Station (Traditions). This subdivision was to be targeted to middle-income, first-time home buyers.

This 15.43-acre parcel, then consisting of raw land, was situated along Carey Station Road in the middle of the Parent Tract, with no access to Lake Oconee. This parcel was adjacent to, and shared its southwest border with, the Subject Property. The map below shows how the Subject Property (referenced as a star) is situated in relation to Traditions (referenced as 7) and other residential communities in Lake Oconee, including Reynolds Lake Oconee (1), Reynolds Landing (2), Great Waters (3), and Del. E. Webb (6):



**[\*16]**  The Reynoldses sold the 15.43-acre parcel to the joint venture for $277,740, or $18,000 per acre.  TPA, a 50% owner of the joint venture, was wholly unrelated to the Reynoldses or any entities owned by them.  The $18,000-per-acre price was an arm's-length price that reflected the FMV of this parcel.

Traditions ultimately took the form of a horse-shoe-shaped residential subdivision that would accommodate 42 single-family homes.  The Reynolds/TPA joint venture managed the first two construction phases, running from 2014 through 2021.  They began selling homes in 2015; that year Traditions sold six homes ranging in value from $244,000 to $338,000.  In 2016 Traditions sold ten homes ranging in value from $229,000 to $331,600.  As of 2017 Traditions had 26 homesites left for sale within its original 15.43-acre parcel, and it was contemplating expansion by acquiring additional acreage nearby.

During 2014–2015 TPA was the only developer or investor that expressed serious interest in any portion of the Parent Tract.  In early 2015 the Reynoldses prepared on behalf of Carey Station LLC a document captioned "authorization to show unlisted property."  This document was intended to grant Ted Baker, a real estate broker, the right to offer the entire Parent Tract (then consisting of 960 acres) for sale at $7.7 million, or roughly $8,000 per acre.  The $7.7 million offering price was close to the price at which the Reynoldses had offered the Parent Tract to TPA in late 2013.

Mr. Baker erected a 40-square-foot sign on the Parent Tract, describing it as "Carey Station Mixed Use Development" and advertising it for sale.  This sign invited interested buyers to contact him by calling his phone number or visiting his website, both of which were listed on the sign.

As far as the record reveals, Mr. Baker was contacted by only one prospective buyer, represented by James Thwaite.  On March 24, 2015, Mr. Baker sent Mr. Thwaite a copy of the "authorization to show unlisted property" and asked him to sign it.  Mr. Baker explained that this document, which authorized him to quote a sale price of no less than $7.7 million, "gives us three months to enter into a Purchase and Sale Agreement with your proposed buyer."  Mr. Thwaite signed the document two days later.

Mr. Thwaite and his brother showed the Parent Tract to the client, going "up and down every available road" and trying to show the

[*17] client "every acre they could get into."  The Reynoldses met with the buyer but could not close a deal for any portion of the property, even though the buyer allegedly "had $4.4 million to spend," because of the buyer's need to complete a like-kind exchange.

## VIII.  *Investigating a Conservation Easement*

In early 2015 Carey Station LLC lacked the capital to develop the Parent Tract, and the Reynoldses were not optimistic about finding a buyer or joint venture partner who would pay their $7.7 million asking price.  They accordingly began investigating the possibility of wringing cash from the Parent Tract by granting a conservation easement over it.

Seeking assistance with this investigation, the Reynoldses and their agents initiated communications with Todd Ciavola of the Vola Group, a local real estate company.  On January 9, 2015, Mr. Baker—the broker representing the Reynoldses—emailed Mr. Ciavola to request a meeting, indicating that "Jamie [Reynolds] said we should get together and discuss the new plan that you and he discussed."

One week later, on January 16, 2015, the Vola Group sent the Reynoldses a letter thanking them for their "interest in engaging Vola Group to help [them] maximize the value of [their] return on the Carey Station Road Tract."  Attached to the letter was a proposed engagement letter.  The Vola Group was not formally retained until April 2015, when Carey Station LLC executed a revised version of this letter.  The revised agreement stated that the Vola Group was being retained "to determine the viability and sale proceeds of a monetized conservation easement."

The agreement provided that an easement transaction would be consummated only if Carey Station LLC "decide[d] that the net proceeds from conservation easement are acceptable."  Throughout the ensuing discussions and negotiations, the Reynoldses consistently took the view that the proceeds accruing to them would be "acceptable" only if such proceeds exceeded $7 million.  This approach was consistent with the Reynoldses' asking price for the Parent Tract during their 2013–2014 negotiations with TPA ($7.9 million, followed by $6.7 million) and in the 2015 listing agreement for the Parent Tract ($7.7 million).

In February 2015, two months before being formally retained, Mr. Ciavola contacted Strategic Capital Partners, LLC (SCP), whose principals were Ricky Novak and James Freeman.  SCP was in the business of arranging and helping to market syndicated conservation easement transactions,  performing  functions  commonly  regarded  as  being

[*18] performed by a "promoter."[3]  Mr. Ciavola emailed Mr. Novak on February 10, 2015, explaining the background and scheduling a meeting.  In this email, Mr. Ciavola sketched out scenarios that estimated values for the Parent Tract (as-is and developed out) ranging from $4 million to $40 million.

Mr. Ciavola met with Mr. Novak on February 12, 2015.  During this meeting Mr. Novak explained that SCP's current underwriting model presupposed that investors would typically be offered a $4.35 tax deduction for every $1 invested.  (Mr. Novak testified at trial that this was the "going rate" in the market for syndicated conservation easements at that time.)  In order for the Reynoldses to derive net proceeds of $7 million, Mr. Novak indicated that the Parent Tract would need to have an appraised value of around $60 million.

On February 13, 2015—the very next day, and well before it was formally engaged—SCP supplied Mr. Ciavola with a schedule captioned "Estimated Sources and Uses of Funds."  This schedule employed a standard template that SCP used for its conservation easement transactions.  It showed an "estimated charitable contribution deduction" of $60 million and a tax-deduction-to-investment ratio of 4.35 to 1.  As of February 13, 2015, neither Mr. Novak nor anyone else at SCP had seen an appraisal of the Parent Tract, any offer to buy or sell the Parent Tract, or any opinion of its value (other than the figures suggested in Mr. Ciavola's email).

The following day SCP forwarded to Mr. Ciavola a "corrected" schedule, with some entries changed, but with the same bottom line:  An "estimated charitable contribution deduction" of $60 million and a tax-deduction-to-investment ratio of 4.35 to 1.  Three weeks later, on March 4, SCP supplied a third iteration of this schedule, again with the same bottom line:  An "estimated charitable contribution deduction" of $60 million and a tax-deduction-to-investment ratio of 4.35 to 1.

In an email sent March 26, 2015, Mr. Ciavola informed Mercer and Jamie that "Ricky [Novak] is confident of a range from $40MM-$75MM, depending on the appraiser's verbal," and indicated that "we are over $7MM."  In stating that "we are over $7MM," Mr.

---

[3] "Promoter" is a loaded term in the syndicated conservation easement space because of the penalty imposed on "promoters" by section 6700(a).  In this Opinion we use the term "promoter" in its ordinary sense, making no determination as to whether SCP or Mr. Novak or Mr. Freeman was a "promoter" within the meaning of section 6700(a), a question that is not before us.

[*19] Ciavola referred to the aggregate proceeds the Reynoldses could expect to receive from the contemplated easement transaction. Those proceeds would derive from selling LLC units to investors, management fees, and satisfaction of the $2.6 million Farmers Bank loan that then encumbered the Parent Tract. SCP knew that the Reynoldses might decline to proceed with the easement transaction if they were not guaranteed their desired $7 million share of the "net proceeds."

At Mr. Ciavola's suggestion, Carey Station LLC engaged Timothy Pollock, a lawyer at Morris, Manning & Martin, LLP (Morris firm), to perform legal services "in connection with a potential conservation easement." Mr. Pollock was familiar with this subject: Over a 10-year period he worked on 250 conservation easement transactions and invested in several easement deals himself. In April 2015 the Reynoldses asked Mr. Pollock to negotiate an agreement with SCP under which they would not have to proceed with a conservation easement unless the investors, in the aggregate, received a "[m]inimum Charitable Contribution Deduction [of] $60-75M."

On behalf of the Reynoldses, the Morris firm duly negotiated an engagement agreement between SCP and Carey Station LLC. That agreement, executed in May 2015, provided that SCP would offer services in three phases. During Phase 1 SCP would determine the "minimum equity capital" to be raised from investors and the "estimated net proceeds" accruing to the Reynoldses. These amounts would be shown in schedules displaying "Estimated Sources and Uses of Funds," employing the same template SCP had used when making its initial projection in February 2015. After reviewing these numbers the Reynoldses would decide whether to move to Phase 2, which would include developing a strategy for marketing the easement transaction and drafting a PPM to solicit investors. Phase 3 would cover the period after the easement was granted.

On June 12, 2015, Mr. Novak emailed Thomas Wingard and Martin Van Sant, who had previously appraised conservation easements for SCP clients, to inform them that Carey Station LLC had engaged SCP. Mr. Novak indicated that he would meet with the Reynoldses to determine what acreage or development rights they might wish to hold out of the easement. On July 9, 2015, Messrs. Wingard and Van Sant were given a tour of the Parent Tract. Three days later they sent a letter to the Morris firm proposing to appraise a conservation easement on the Parent Tract. The Morris firm executed the engagement letter with

[*20] them, in part because of a desire to "maintain attorney client privilege on the appraisal results."

In August 2015 Mercer notified his children that "[w]e are close to a deal for selling our land to an outside investment group." He indicated that "the appraisal will be somewhere around $70 million which will net Carey Station [LLC] $6.7 million after debt retirement." He noted that "we can carve out . . . property that we continue to own." He described all of this as "good news."

IX.    *Completing Phase 1*

SCP's principal task during Phase 1 was to determine the equity capital to be raised from investors ("Minimum Threshold Capital Raise") and the estimated net proceeds accruing to the Reynoldses after payment of the promoter's fees and other transaction costs. Because investors were to be promised a charitable contribution tax deduction of at least $4 for every $1 invested, the "Minimum Threshold Capital Raise" was directly linked to the value placed on the Parent Tract, on which the magnitude of the promised deduction hinged.

On October 29, 2015, Mr. Ciavola emailed Messrs. Novak and Freeman, stating that he was attaching "the additional information you requested." Included among the attachments was a document titled "Market Summary," suggesting a value of $65 million (or about $73,000 per acre) for 890 acres of the Parent Tract, after excluding unspecified "carve-outs." Later that day Messrs. Novak and Freeman forwarded those documents to Messrs. Wingard and Van Sant, who were then working on an appraisal of the Parent Tract.

On November 16 SCP supplied Mr. Ciavola with another "Estimated Sources and Uses of Funds" spreadsheet showing an estimated charitable contribution deduction of $57.6 million for the easement on the Parent Tract. SCP noted that the Reynoldses were considering withdrawing (or "carving out") certain parcels from the Parent Tract and reserving those parcels for future commercial development. If the Reynoldses did this, SCP estimated that it would decrease the overall valuation of the conservation easement by about $5 million. Mr. Ciavola forwarded this schedule to the Reynoldses.

The following day Mr. Ciavola arranged a conference call with the Reynoldses and SCP's principals. The purpose of this call was to "review[] the conservation easement for the Carey Station parcel." "Following this call," he said, "we need to decide whether or not we move on

[*21] to Phase II." Mercer separately emailed Jamie, explaining that the upcoming discussion would be "regarding the Carey Station appraisal, which will be a close call as to whether we go forward on the sale."

On November 18 Mr. Ciavola emailed the Reynoldses a new "Estimated Sources and Uses of Funds" spreadsheet, which he described as having been "revised from last night's discussion." This schedule showed an "estimated charitable contribution deduction" before carve-outs of $60,608,700. If the carved-out parcels were removed from the Parent Tract before the granting of the easement, the schedule showed a net "estimated charitable contribution deduction" of $52,873,765.

At that point Messrs. Wingard and Van Sant had not yet supplied an appraisal of the Parent Tract. Mr. Ciavola told SCP to "call the appraiser" because the Reynoldses needed a "'verbal' value" in order to proceed with the transaction. Mr. Freeman responded: "We all have the window and need to work within that window. The appraisers are pulling the exact figures together . . . . The window you have is within the ballpark of reality and from that you all need to decide whether or not you are moving forward."

On November 24, 2015, Mr. Ciavola told Mr. Pollock that the Reynoldses were "moving ahead with Phase II," i.e., authorizing SCP to market the conservation easement transaction to investors. The Reynoldses made that decision before receiving a written opinion of value from the appraisers.

X.      *Formation of the Entities*

SCP recommended, and the Reynoldses agreed, that the Parent Tract be divided into three separate parcels for purposes of marketing the conservation easement deal. Pursuant to this plan, Carey Station LLC would transfer parcels to three separate entities, referred to as "Property Companies" or "PropCos." Each PropCo would be owned by an "Investment Company" or "InvestCo," and units in the InvestCos would be marketed to investors. Each PropCo would grant a conservation easement on its parcel. The investors would then receive, through the InvestCo, pro rata shares of the tax deduction that the PropCo claimed for the easement. Messrs. Wingard and Van Sant were accordingly directed to prepare three appraisals rather than one.

**[\*22]**  Before creating the three parcels on which easements were to be granted, the Reynoldses decided to "carve out" 82.22 acres from the Parent Tract and retain ownership of that acreage in Carey Station LLC. Because these carved-out parcels were situated at important highway intersections and/or adjacent to existing or proposed future developments, they were more valuable than much of the acreage left in the Parent Tract.  The 82.22 acres thus carved out consisted of six parcels, as follows:

● a 16.72-acre parcel and a 32.23-acre parcel adjacent to Traditions, on which that subdivision was expected to expand.  This expansion contemplated the addition of 37 additional homesites immediately adjacent to the Subject Property;

● an 18.9-acre parcel intended for an expected future expansion of Lake Oconee Academy;

● a 3.8-acre parcel and a 5.0-acre parcel at the intersection of Highway 44 and Carey Station Road, near Good Samaritan Hospital; and

● a 5.57-acre parcel on Highway 44 across from an entrance to Reynolds Plantation.

After the exclusion of these carved-out parcels, the Parent Tract was reduced to 874 acres.  SCP proposed, and the Reynoldses agreed, that Carey Station LLC would contribute that acreage to three PropCos.  Oconee (the partnership in this case) would receive 355 acres (the Subject Property).  The other two PropCos—Richland Creek Holdings, LLC (Richland Creek), and Carey Station Property, LLC (CS Property)—would receive 260 and 259 acres, respectively.

The following map shows the configuration of the acreage contributed to the three PropCos.[4]  "Site 1," on the south-southwestern side of the Parent Tract, represents the Subject Property.  "Site 2," in the center of the Parent Tract, represents the 259-acre parcel contributed to CS Property.  "Site 3," on the north-northeastern side of the Parent Tract, represents the 260-acre parcel contributed to Richland Creek. Each Site is shown as subdivided into a number of sub-parcels.

---

[4] On this map, the Parent Tract is rotated clockwise from true north, such that the northernmost portion of the property appears at the top right.

[*23]



The three PropCos were formed on November 23, 2015. The three InvestCos—including Oconee Investors, petitioner in this case—were formed the next day. On December 9, 2015, each InvestCo executed an operating agreement stating that it was established for the purpose of soliciting funds from investors and using those funds to acquire from Carey Station LLC class A units of the PropCo with which it was paired.

Carey Station Manager, LLC (CS Manager), was formed on December 9, 2015. It functioned as the manager of each InvestCo and was controlled (through intervening entities) by the Reynoldses. The following day Carey Station LLC executed an agreement with each PropCo, promising to contribute to it, in exchange for a 99% interest in it, the relevant portion of the Parent Tract as described above. CS Manager would hold the other 1% of each PropCo in exchange for a separate capital contribution.

[*24] XI.  *The Appraisals and PPMs*

On December 3, 2015, Messrs. Wingard and Van Sant provided a "Restricted Appraisal Report" for the Subject Property.  On December 10 and 12 they provided restricted appraisal reports for the other two parcels.  They assumed that the HBU of each parcel before the granting of the easement was for immediate mixed-use residential development.  The appraisals did not cite any sales of comparable land in Georgia, relying on allegedly comparable property transactions in Florida and North Carolina.  Opining on the "before value" of each parcel, the "after value" of each parcel (following granting of the easement), and the purported value of the easement (subtracting the latter from the former), Messrs. Wingard and Van Sant came up with the following values for the three conservation easements:

| Parcel | Acreage | "Before" Value | "After" Value | Easement Value |
|---|---|---|---|---|
| Subject Property | 355 | $21,200,000 | $530,000 | $20,670,000 |
| Richland Creek | 260 | 15,200,000 | 390,000 | 14,810,000 |
| CS Property | 259 | 15,300,000 | 390,000 | 14,910,000 |
| **Total** | **874** | **$51,700,000** | **$1,310,000** | **$50,390,000** |

As noted earlier, the Parent Tract originally consisted of 1,130 acres.  Between 2003 and year-end 2015 the Reynoldses had carved off 256 of the most valuable acres for sale or for future development by Carey Station LLC.  The restricted appraisal reports valued the 874 acres remaining in the Parent Tract as having an average "before" value of $59,153 per acre.  The appraisal of the Subject Property, which comprised 355 acres, valued it as having a "before" value of $59,718 per acre.

On December 9, 2015, petitioner, Oconee Investors, circulated a PPM soliciting investors to purchase class A units in it.  On December 10 and 11, the other two InvestCos circulated PPMs soliciting investors to purchase class A units in them.  The terms of the three PPMs were substantially similar, and the terms of the PPM issued by petitioner are illustrative.

The PPM issued by petitioner offered to sell 95 class A units in Oconee Investors at $49,000 per unit, for a total offering price of $4,655,000.  If the offering were fully subscribed, class A members would acquire 98% of the voting and economic interests in Oconee

[*25] Investors.[5]  The class A members of Oconee Investors, in turn, would acquire a 97% ownership interest in Oconee.[6]  The PPM advised that five additional class A units in Oconee Investors would be issued at the closing to Bridge Capital, an entity owned by Messrs. Freeman and Novak.  Ignoring those five additional units for simplicity's sake, the investors who subscribed to the class A offering in Oconee Investors would acquire, in economic terms, roughly a 95% interest in Oconee (98% × 97% = 95.06%).

At that point it was expected that Oconee would receive the 355-acre Subject Property, which would be its only meaningful asset, and Oconee had no significant liabilities.[7]  By paying $4,655,000, the class A investors thus acquired, in economic terms, a 95% interest in the 355-acre Subject Property.  Simplifying somewhat, the class A offering valued the Subject Property as being worth at most $12,500 per acre ([$4,655,000 × 0.95 = $4,422,250] ÷ 355 = $12,457).

Each PPM identified two possible business strategies for its PropCo: a "conservation strategy" and an "investment strategy."  Investors were told that CS Manager (owned by the Reynoldses) would determine "whether to cause the respective PropCo to pursue the Investment Strategy or the Conservation Strategy."  In making that decision, CS Manager would "seek input from all Members and may solicit a vote of the Members."  After CS Manager chose which strategy to pursue, it was to provide written notice to investors, who would then have "the right within one (1) calendar day of receipt of the notice to vote to reject such proposal."  If an investor did not submit a timely vote, that investor would be deemed to have accepted CS Manager's chosen strategy.

The PPM issued by petitioner, Oconee Investors, is again illustrative.  Petitioner's "conservation strategy" was to grant a conservation easement over the Subject Property and allocate the resulting tax deduction among the investor/members.  The PPM attached an excerpt from the Wingard/Van Sant "restricted appraisal."  Because that

---

[5] The remaining 2% of the voting and economic value of Oconee Investors was to be held by class B unit holders, namely CS Manager (owned by the Reynoldses) and an entity owned by Messrs. Freeman and Novak.

[6] The remaining 3% of Oconee was to be held by class B unit holders, namely CS Manager and Carey Station LLC, both owned by the Reynoldses.

[7] Oconee's only other asset at that point was a partnership receivable of $34,000, and its sole liability was the obligation to pay an accrued appraisal fee of less than $35,000.

[*26] appraisal was restricted to use by the Reynoldses and their advisors, petitioner was not authorized to include this excerpt in the PPM, and Mr. Van Sant was allegedly unaware that this was being done.

The "investment strategy" was to develop the Subject Property into a mixed-use residential community, likely in conjunction with a third-party developer. The PPM cautioned investors that "a hold period of one to three years or longer may be required before development will occur or a sale to a developer could be consummated at an acceptable value." The PPM included financial projections suggesting that it would take six years to sell off the entirety of the Subject Property. It warned that these projections, which supposed a 31.6% internal rate of return annually, were "based on assumptions that may or may not occur and should not be relied upon to indicate the actual results that will be obtained." One such assumption was that development of the Subject Property would begin within one year after the closing—an assumption in tension with the warning that a holding period of "three years or longer may be required before development will occur."

Each PPM was 250 pages long, and SCP did not expect that investors would read it with great care. SCP accordingly prepared a two-page "Offering Summary & Case Study" (Offering Summary) for each InvestCo. This document focused exclusively on the tax benefits of the "conservation strategy," advising that pursuing this strategy would net the investor a tax deduction of roughly $4 for every $1 invested. The Offering Summary contained no meaningful discussion of the economic benefits that would supposedly flow from the "investment strategy."

In conjunction with the Offering Summary, SCP prepared an Excel spreadsheet, denominated "Investor Benefit Analysis." This spreadsheet enabled a prospective investor to calculate the "benefit[s] from [the] conservation tax mitigation strategy." For example, the spreadsheet shows that a $96,000 investment in petitioner would generate a tax deduction of $383,567 with an alleged "cash value" of $172,605. Investors could plug in their adjusted gross income (AGI), expected itemized deductions, and applicable Federal and state tax rates to calculate their particular tax benefits.

SCP had communicated with prospective investors about the proposed transaction as early as October 2015. These earlier communications, usually by email, likewise focused exclusively on the tax benefits of the transaction. Emails from Mr. Novak repeatedly touted a 4:1 tax write-off and recommended the number of units investors should

[*27] purchase on the basis of their expected AGI. Marketing material received by one investor, captioned "The Potential Tax Benefits Associated with Conservation Easements," described the 4:1 tax write-off as meaning that "you save more money on taxes than you invested in the partnership and hence made a gain." This document asserted that SCP "had successfully closed 62 conservation easement projects" and "had never been audited by the IRS." None of SCP's marketing materials addressed the supposed benefits of the "investment strategy." None of SCP's marketing materials described (or even mentioned) the environmental values allegedly protected by the "conservation strategy."

XII.  *Year-End 2015 Transactions*

On December 21, 2015, in accordance with Oconee's operating agreement, Carey Station LLC contributed the 355-acre Subject Property to Oconee in exchange for 99% of the membership interests in Oconee. On December 23, 2015, Oconee Investors acquired all of the class A interests in Oconee (constituting 97% of the total interests) from Carey Station LLC in exchange for $3.74 million. Of that total, $2.44 million was paid to Carey Station LLC and $1.3 million was contributed to Oconee.

Oconee then amended its operating agreement to name Oconee Investors its manager. The amended agreement integrated the terms set out in the PPM and provided that Oconee Investors, in its capacity as manager of Oconee, would review and analyze the "investment strategy" and "conservation strategy" and determine which to pursue. That same day Oconee Investors sold to investors, for $4,655,000, 95 of its 100 total outstanding class A units.

Substantially identical steps were followed by the other two PropCos and InvestCos. The total amount raised from investors via the three PPMs was $11,856,000. Of these proceeds, Carey Station LLC (owned by the Reynoldses) received $5,137,500 from the sale to the InvestCos of 97% of its interests in the PropCos. The PropCos and the InvestCos retained $3.75 million of the proceeds as capital contributions and operational reserves. Of the balance, $2,723,500 was paid to the promoters, Mr. Ciavola, the Morris firm, the appraisers, and other participants as fees for their services.

On December 24, 2015, the Reynoldses, as Oconee's ultimate managers, notified the class A members of their determination that Oconee should pursue the "conservation strategy." Any investor who

[*28] wished to pursue the "investment strategy" was required to "affirmatively reject" the Reynoldses' determination by December 28, 2015. Twenty-six members were entitled to vote to accept or reject the Reynoldses' decision. Of the 24 individual investors in Oconee Investors, 12 explicitly approved the Reynoldses' determination to pursue the "conservation strategy." The other 12 investors did not submit an "affirmative rejection" and were thus deemed to have approved the "conservation strategy."[8]

All investors in the other two PropCos were likewise unanimous in voting for (or being deemed to have voted for) the "conservation strategy." Mr. Pollock testified that no investor in a conservation easement transaction in which he had invested had ever voted for the investment option. There was no evidence that any investor in any syndicated conservation easement transaction, when offered a choice between a deduction for a conservation easement and pursuit of an investment/development option, had ever voted for the investment/development option.

The transaction at issue was persistently marketed to investors as a "conservation tax mitigation strategy." From beginning to end, it was priced as a multiple of the promised tax deduction. Mr. Freeman acknowledged that the $49,000 offering price for class A interests in petitioner was derived directly from the four-to-one tax write-off promised to investors. That offering price bore no relationship whatsoever to the financial projections for the purported "investment strategy." The Court finds as a fact that the purported "investment strategy" was not a viable business proposition, that it was never intended to be implemented, and that it was included as "window dressing" in an effort to obscure the character of the transaction as a tax shelter.[9]

On December 31, 2015, Oconee donated to the Georgia-Alabama Land Trust (GALT) a conservation easement over the 355-acre Subject

---

[8] The other two members eligible to vote on whether to pursue the "conservation strategy" were CS Manager (owned by the Reynoldses) and an entity owned by Messrs. Novak and Freeman. Both voted in the affirmative.

[9] Each easement transaction had a put/call provision under which individual investors could be bought out five years after their investment. In November 2015 Mr. Freeman told Mr. Ciavola that the total cost of buying out the individual investors in all three transactions would be only about $435,000. The financial projections set forth in the PPM for the "investment strategy" suggested that it would take six years to sell off the entirety of the Subject Property, and those projections were wildly optimistic. If the investors had regarded the "investment strategy" as a realistic option, they would not have consented to be bought out for a pittance after only five years.

[*29] Property. The deed of easement was recorded the same day. The other two PropCos concurrently donated to GALT conservation easements over their 259-acre and 260-acre tracts.

XIII. *Final Appraisals*

Messrs. Wingard and Van Sant received substantive comments on their December 3, 2015, Restricted Appraisal Reports from the Private Client Law Group (PCLG), which was engaged to provide "comfort letters" to investors in the three InvestCos. Noting that these reports included no sale transactions of comparable properties in Georgia, PCLG "recommend[ed] that the appraisers use at least one comparable in the state of Georgia (preferably more)."

PCLG also believed it "important that the valuation account for the fact that all [three] deals or 'phases' [i.e., the proposed residential subdivisions on the three PropCos] would hypothetically be hitting the market at the same time." But the Restricted Appraisal Reports included "no analysis as to how having all those properties . . . on the market at the same time would affect the market valuation under each appraisal." "One would think," PCLG noted, "that all that supply would have an adverse impact on pricing. Therefore, please have the appraisers discuss why that is not the case here."

The final appraisal reports, completed in April 2016, ignored PCLG's point that the supply/demand balance would be adversely affected if residential subdivisions on all three PropCos were on the market simultaneously. However, Messrs. Wingard and Van Sant did replace one of their comparable property sales, from Florida, with a sale that had occurred in Georgia. Despite this change, the "before" value they gave the Subject Property in their final appraisal was exactly the same as it was in their December 2015 Restricted Appraisal, viz., $21.2 million. And the "before" values they gave the tracts held by the other two PropCos were likewise unchanged from December 2015, despite using different comparable property sales.

XIV. *Tax Returns*

Oconee timely filed Form 1065, U.S. Return of Partnership Income, for its short taxable year beginning December 24 and ending December 31, 2015. On that return it claimed a charitable contribution deduction of $20.67 million for the donation of the easement. In support of this supposed value Oconee relied on the final appraisal completed in April 2016 by Messrs. Wingard and Van Sant. Oconee allocated

[*30] $20,049,900 of the deduction (97% of the total) to Oconee Investors. The remaining 3% of the deduction was allocated to class B unit holders (CS Manager and Carey Station LLC, both owned by the Reynoldses).

Oconee included with its return a Form 8283, Noncash Charitable Contributions. On this form Oconee asserted that its adjusted basis in the Subject Property was $3,348,498. Petitioner produced at trial a document captioned "2015 Conservation Easement Basis Calculation," showing how it computed this number. But that document assumes two facts: (1) that Carey Station LLC had a basis of $9,104,937 in the Parent Tract and (2) that Oconee acquired a carryover basis of $3,362,116 (37% of the total) when Carey Station LLC contributed the 355-acre parcel to it.

The former number, $9,104,937, appears to have been derived from Carey Station LLC's Form 1065 for 2014. On Schedule L, Balance Sheets per Books, Carey Station LLC reported "Land" with a cost of $9,104,937 at year-end 2014. Petitioner has produced no evidence that substantiates that "basis" number. Specifically, petitioner has produced no evidence to establish the Reynoldses' original cost for the Parent Tract, acquired in 2003, or to establish the numerous adjustments to basis required by the sale of various parcels that were carved out of the Parent Tract after 2003.

Oconee indicated on its Form 8283 that the Subject Property had been acquired by "capital contribution." In a five-page supplement to its Form 8283, Oconee asserted that the Subject Property "was a 'capital asset' . . . as defined by Code Section 1221(a)" in the hands of its successive owners, viz., Jamie Reynolds and Reynolds Partners, Carey Station LLC, and Oconee. Because the Subject Property was supposedly "long-term capital gain property" in Oconee's hands, the members of Oconee and Oconee Investors were assertedly "permitted to claim a deduction for federal income tax purposes in an amount equal to the fair market value (as opposed to the tax basis)" of the donated easement.

On its Form 1065 for its short taxable year beginning December 24 and ending December 31, 2015, Oconee Investors reported a charitable contribution deduction of $20,093,550, consisting of its 97% share of the deduction claimed for the easement and a cash contribution of $43,650. These deductions were passed through to the class A and class B investors. As promised in the PPM, each class A investor received a deduction of approximately four times his or her investment. For

[*31] example, an investor who was reported to have contributed capital of $784,000 was allocated a charitable contribution deduction of $3,143,823, i.e., 400.99% of his investment.

## XV. *IRS Examination*

The IRS selected Oconee's 2015 return for examination. On April 4, 2019, it issued an FPAA that disallowed $20.67 million of the claimed contribution deduction (the portion attributable to the easement), determining that Oconee had not established that it made a contribution or gift in 2015 and had otherwise failed to show that all requirements of section 170 had been met. The FPAA alternatively determined that Oconee had failed to establish "that the value of the contributed property . . . was greater than $1,420,560." The IRS determined a 40% accuracy-related penalty under section 6662(e) and (h) (applicable in the case of a "gross valuation misstatement") and (in the alternative) a 20% penalty under other provisions of section 6662.

Petitioner timely petitioned for readjustment of partnership items. In his Answer filed September 6, 2019, respondent asserted (again in the alternative) a 20% penalty for a reportable transaction understatement under section 6662A(b). *See* § 6214(a). The parties agree (and the record establishes) that the IRS secured timely supervisory approval to assert each of these penalties. *See* § 6751(b)(1).

## XVI. *Trial*

### A. *Petitioner's Experts*

#### 1. *Belinda Sward*

Petitioner offered testimony from Belinda Sward, the founder of Strategic Solutions Alliance, a real estate consulting firm that petitioner engaged to provide a "market analysis" for the Subject Property. She described her methodology as including "an interview process with the local and regional real estate professions," "confidential data and analysis from previous work . . . in the market that involved Lake Oconee communities," and "consumer research conducted in 2021 [involving] customers qualified and interested in buying a home at Lake Oconee" or in a similar community. These consumers were asked questions "about their lifestyle, opinions of these communities, types of housing recently purchased," and the sorts of amenities they were seeking when considering the purchase of a second or retirement home. The thrust of her report was that the Lake Oconee area is a desirable destination, and this

**[\*32]** desirability helps account for the increase in housing sales and prices for years through 2022.

Ms. Sward's expert report relied extensively on data and information from 2016–2022 in an effort to support her conclusions about the real estate market in 2015. The bulk of the consumer research was conducted in 2021 and much of the sales and housing data also post-dated 2015. By Order served November 15, 2022, we granted in part respondent's Motion in Limine and excluded all portions of Ms. Sward's report that discussed or relied on post-2015 consumer research and post-2015 market data. The parties agreed on the strikethroughs to Ms. Sward's report required by our Order, and she testified at trial as to the balance of her report. We found her testimony to have little relevance in ascertaining the FMV of the conservation easement.

2.    *Rick McAllister*

Petitioner offered expert testimony of Rick McAllister, the landscape architect who had prepared the 2015 conceptual land use plan that Messrs. Van Sant and Wingard used in their appraisal. We recognized Mr. McAllister as an expert in land use planning, while taking into account his past relationship with the Reynoldses in assessing his testimony. Mr. McAllister's report consists of a land use plan for the Subject Property prepared in 2022. Like his 2015 plan, which covered the entire Parent Tract, his 2022 plan approached the maximum density possible under local zoning rules.

Mr. McAllister's 2022 plan presupposes the development of 1,012 residential units on 162.1 acres of the Subject Property, including single-family homes, multifamily units, senior housing, and cottages. His plan envisions commercial development on 89 acres, including retail outlets, a hotel, restaurants, an entertainment center, office space, and a 165-unit continuing care facility. He assumed that the remaining 104 acres would be used as common open space. He did not opine on the financial feasibility of his proposed development, nor did he address whether there was sufficient market demand in 2015 for 1,012 new residential units in that location.

3.    *George Galphin, Jr.*

Petitioner offered expert testimony from George Galphin, Jr., a certified real property appraiser in Georgia. He has more than 30 years of experience in appraisals, primarily in the north Georgia region, and has prepared conservation easement appraisals periodically over the

[*33] last decade. We recognized him as an expert in real estate valuation, including conservation easements.

Mr. Galphin opined that the HBU of the Subject Property was immediate development as a mixed-use residential community. In reaching that conclusion, he relied heavily on Ms. Sward's "market analysis" and Mr. McAllister's 2022 conceptual land use plan. He made the extraordinary assumption that Mr. McAllister's 2022 site plan "would be approved by Greene County."

Mr. Galphin opined that the "before" value of the Subject Property was $19.53 million, or $55,014 per acre. He reached this conclusion using the comparable sales method, choosing sales of five allegedly comparable properties in Georgia. Before drafting his Report, he had been informed of petitioner's position that the "before" value of the Subject Property was $21.2 million. He was not informed of the Reynoldses' prior efforts to sell the entire Parent Tract at prices ranging from $6.7 million to $8.3 million. He was not aware that the Parent Tract (including the Subject Property) was held for sale in 2015.

### 4. *James Clanton*

Petitioner offered expert testimony from James "Chris" Clanton, the founder of MVC Consulting, Inc., a real estate consulting firm. Mr. Clanton has more than 25 years of experience appraising real estate and is a certified appraiser in Georgia. We recognized him as an expert in real estate valuation.

Like Mr. Galphin, Mr. Clanton opined that the HBU of the Subject Property was immediate development as a mixed-use residential community. Like Mr. Galphin, he relied heavily on Ms. Sward's "market analysis" and Mr. McAllister's 2022 land use plan in reaching that conclusion. But he provided "no assurances, expressed or implied, regarding the accuracy of the information" in their reports.

Mr. Clanton opined that the "before" value of the Subject Property was $16.7 million, or $47,042 per acre. He reached this conclusion using the comparable sales method, choosing sales of four allegedly comparable properties. Only one of these transactions involved real estate in Georgia; the other three involved real estate in Florida, North Carolina, and South Carolina. He also considered two "additional land sales" in Florida and South Carolina.

**[\*34]** Before drafting his report, Mr. Clanton had been informed of petitioner's position that the "before" value of the Subject Property was $21.2 million. He was given copies of the Wingard/Van Sant final appraisal report, the 2011 appraisal prepared for PNC, and the 2014 appraisal prepared for Farmers Bank. Mr. Clanton was not informed of the Reynoldses' prior efforts to sell the entire Parent Tract at prices ranging from $6.7 million to $8.3 million. He was not aware that the Parent Tract (including the Subject Property) was held for sale in 2015.

### B.  *Respondent's Valuation Expert*

Respondent offered expert testimony from Robert Driggers. Mr. Driggers has more than 35 years of experience appraising real estate in Georgia, including appraisals of residential developments. Certified as an appraiser by the State of Georgia and a licensed broker, Mr. Driggers holds MAI and CCIM designations and has completed the Appraisal Institute's course on valuing conservation easements. The Court recognized him as an expert in real estate appraisal.

Before preparing his report, Mr. Driggers was informed neither of petitioner's nor of respondent's position as to the value of the easement. He was not supplied a copy of the Wingard/Van Sant appraisal, nor was he informed of prior appraisals relating to the Parent Tract.

Mr. Driggers noted that, when the easement was granted in late 2015, "[t]he country and Greene County were still in recovery mode from the Great Recession." He concluded that immediate residential development of the Subject Property, as proposed by petitioner and its experts, was unlikely given its physical characteristics and the existing market conditions. He determined that the HBU of the property was a "speculative hold for future mixed-use development." "Based on development patterns and real estate activity existing for the area," he concluded, "a hold of some seven to ten years is probable with regard to widespread development of the property, though some smaller portions may be saleable sooner."

Mr. Driggers calculated a value of $4,972,002 for the easement, representing the difference between a "before" value of $5,327,145 (roughly $15,000 per acre) and an "after" value of $355,143. In reaching these conclusions he relied chiefly on the comparable sales method, supplemented by his review of market data and interviews with buyers and sellers of properties in the area.

**[\*35]** Mr. Driggers selected sales of seven comparable properties, all in Georgia. Six of these transactions involved property within 40 miles of the Subject Property (three being located in or near Greensboro). The sales occurred between February 2012 and November 2015 and involved tracts ranging in size from 194.4 acres to 856.6 acres. These tracts had a mix of zoning designations and planned uses.[10]

## OPINION

The IRS's determinations in a notice of deficiency or an FPAA are generally presumed correct, though the taxpayer can rebut this presumption. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Republic Plaza Props. P'ship v. Commissioner*, 107 T.C. 94, 104 (1996). Deductions are a matter of legislative grace, and taxpayers generally bear the burden of proving their entitlement to the deductions claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992).

Section 7491 provides that the burden of proof on a factual issue may shift to the Commissioner if the taxpayer satisfies specified conditions. Among these conditions are that the taxpayer must have "introduce[d] credible evidence with respect to [that] factual issue," § 7491(a)(1), and must have "complied with the requirements under this title to substantiate any item," § 7491(a)(2)(A). Petitioner has not satisfied these conditions with respect to any factual issue that has salience in deciding Oconee's entitlement to the disputed charitable contribution deduction. The burden of proof thus remains on petitioner.

## I.   *Charitable Contribution Deduction*

Section 170(a)(1) allows a deduction for any charitable contribution made within the taxable year. If the taxpayer makes a gift of property other than money, the amount of the contribution is generally equal to the FMV of the property at the time of the gift. *See* Treas. Reg. § 1.170A-1(c)(1). Deductions generally are not allowed for gifts of property consisting of less than the donor's entire interest in that property,

---

[10] Mr. Driggers also performed, as a backup to his comparable sales analysis, a DCF analysis. For that purpose, he assumed that the Subject Property could be developed as a mixed-use community, with lots being sold gradually over a 7- to 10-year period. After considering market data and information obtained from interviews with local land speculators, he employed a 14% discount rate for the 7-year sell-off analysis and a 15% discount rate for the 10-year sell-off analysis. This approach generated a "before" value for the Subject Property of $6,307,954 (or $17,762 per acre) under the former scenario and $5,428,962 (or $15,286 per acre) under the latter.

**[\*36]** but there is an exception for (among other things) a "qualified conservation contribution." *See* § 170(f)(3)(A), (B)(iii). This exception applies where (1) the taxpayer makes a contribution of a "qualified real property interest," (2) the donee is a "qualified organization," and (3) the donation is "exclusively for conservation purposes." § 170(h)(1). Respondent does not dispute that the conservation easement in this case satisfies the latter requirements, apart from questioning the donation's status as a charitable contribution.

Where the claimed value of contributed property (other than publicly traded securities) exceeds $5,000, no deduction is allowed unless the taxpayer obtains a "qualified appraisal" of such property. *See* § 170(f)(11)(C). A qualified appraisal is "an appraisal of such property which . . . is conducted by a qualified appraiser in accordance with generally accepted appraisal standards and any regulations or other guidance prescribed" by the Secretary. *See* § 170(f)(11)(E)(i)(II). Where (as here) a contribution of property is valued in excess of $500,000, the taxpayer must both obtain and attach to its return "a qualified appraisal of such property." § 170(f)(11)(D). Failure to comply with these requirements generally precludes a deduction. *See* § 170(f)(11)(A)(i) (providing that "no deduction shall be allowed" unless specified substantiation requirements are met).

Section 170(e)(1) provides that "[t]he amount of any charitable contribution of property" shall be reduced by (among other things) "the amount of gain which would not have been long-term capital gain" if the property had been sold instead of being contributed. Property subject to this provision, generally called "ordinary income property," includes inventory property, i.e., property held for sale to customers in the ordinary course of business. As a rule, the deduction allowable for a gift of "ordinary income property" is limited to the taxpayer's basis in such property.

Respondent contends that Oconee's charitable contribution deduction should be denied in its entirety on three distinct and independent grounds: (1) Oconee lacked the donative intent requisite to a "charitable contribution" within the meaning of section 170(a)(1); (2) the appraisal attached to Oconee's return was not a "qualified appraisal" because the authors, Messrs. Wingard and Van Sant, were not "qualified appraisers"; and (3) the Subject Property was "ordinary income property" in Oconee's hands, thereby limiting any charitable contribution deduction to its basis, which Oconee allegedly failed to prove was greater than zero. We consider these arguments in turn.

**[\*37]**  A.     *Donative Intent*

"The *sine qua non* of a charitable contribution is a transfer of money or property without adequate consideration." *United States v. Am. Bar Endowment*, 477 U.S. 105, 118 (1986).  If a transaction with a charity "is structured as a *quid pro quo* exchange"—i.e., if the taxpayer receives property or services equal in value to what he conveyed—there is no "contribution or gift" within the meaning of the statute.  *Hernandez v. Commissioner*, 490 U.S. 680, 701–02 (1989).

In assessing whether a transaction constitutes a "quid pro quo exchange," we give most weight to the external features of the transaction, avoiding imprecise inquiries into taxpayers' subjective motivations.  *See id.* at 690–91; *Christiansen v. Commissioner*, 843 F.2d 418, 420 (10th Cir. 1988).  "If it is understood that the property will not pass to the charitable recipient unless the taxpayer receives a specific benefit, and if the taxpayer cannot garner that benefit unless he makes the required 'contribution,' the transfer does not qualify the taxpayer for a deduction under section 170."  *Costello v. Commissioner*, T.C. Memo. 2015-87, 109 T.C.M. (CCH) 1441, 1448; *see Christiansen v. Commissioner*, 843 F.2d at 420–21; *Graham v. Commissioner*, 822 F.2d 844, 849 (9th Cir. 1987), *aff'g* 83 T.C. 575 (1984), *aff'd sub nom. Hernandez v. Commissioner*, 490 U.S. 680.  However, if the benefit received is merely incidental to a charitable purpose, then a deduction is allowable.  *See McGrady v. Commissioner*, T.C. Memo. 2016-233, 112 T.C.M. (CCH) 688, 694 (citing *McLennan v. United States*, 24 Cl. Ct. 102, 107 (1991), *aff'd*, 994 F.2d 839 (Fed. Cir. 1993)).

Respondent urges that Oconee is not entitled to a charitable contribution deduction because "the primary purpose of the transaction was to derive an economic benefit in the form of tax savings . . . that would exceed each investor's contribution."  "The external features of the transaction," respondent says, "overwhelmingly show that the Partnership donated the conservation easement with the sole intent of generating substantial income tax benefits for its partners."  In respondent's view, the Reynoldses and their agents were engaged in a profit-seeking business transaction:  Oconee never intended to make, and allegedly did not make, "a transfer to a charitable entity exceeding the fair market value of [the] expected consideration," viz., the tax benefits accruing to the partners in Oconee Investors.  In short, because "the overstated tax deduction was the only purpose for the donation," respondent contends that Oconee lacked the donative intent requisite to a charitable contribution.

**[\*38]** Without disputing respondent's characterization of the intentions of the Reynoldses and their agents, we find that these facts, without more, do not suffice to disallow a deduction under section 170(a)(1). Oconee executed a valid deed of easement that conveyed property to GALT, a charitable organization recognized by the IRS as tax exempt under section 501(c)(3). The property thus conveyed had value: Respondent agrees that the easement accomplished valid conservation purposes, and his expert placed upon the easement a value close to $5 million.

The "quid pro quo" cases do not help respondent. In each such case of which we are aware, the "quid" received by the putative donor was supplied by a party to the transaction—typically by the donee, occasionally by another participant in a multiparty transaction. *See, e.g.*, *Hernandez v. Commissioner*, 819 F.2d 1212, 1217 (1st Cir. 1987) (religious "auditing" services provided by donee), *aff'd*, 490 U.S. 680; *Stubbs v. United States*, 428 F.2d 885, 887–88 (9th Cir. 1970) (assistance in obtaining favorable zoning provided by donee); *Allen v. Commissioner*, 92 T.C. 1, 10–11 (1989) (low-interest loan provided by donee), *aff'd*, 925 F.2d 348 (9th Cir. 1991); *Murphy v. Commissioner*, 54 T.C. 249, 253 (1970) (adoption services provided by third party); *DeJong v. Commissioner*, 36 T.C. 896, 899–900 (1961) (education services provided by donee), *aff'd*, 309 F.2d 373 (9th Cir. 1962). Respondent does not contend (and there is no evidence) that GALT provided any "quid pro quo"—in the form of goods, services, or other consideration—to Oconee in exchange for its gift. The "quid pro quos" alleged by respondent are the tax deductions inuring to the investors. But those benefits were provided, not by GALT, but by the U.S. Treasury. Respondent has cited, and we have discovered, no case in which the tax benefits associated with a charitable contribution deduction have been deemed a "quid pro quo" that negates the donor's charitable intent.[11]

---

[11] Recognizing that a tax deduction would not normally be regarded as a "quid pro quo," respondent urges a special rule in a case where a taxpayer has *substantially overvalued* the contributed property. But we do not see how the size of the deduction a taxpayer claims on his tax return has probative value in determining whether he had donative intent for a gift he made the previous year. As we explain *infra* p. 74, Congress has enacted severe penalties for gross overvaluation of charitable contribution property. It is not our province to create, as an additional sanction for overvaluation, the complete disallowance of any deduction.

**[\*39]** B.     *"Qualified Appraiser" Requirement*

Section 170(f)(11) disallows a deduction for certain noncash charitable contributions unless specified substantiation and documentation requirements are met.  In the case of a contribution of property valued in excess of $500,000, the taxpayer must obtain and attach to his return "a qualified appraisal of such property."  § 170(f)(11)(D).  An appraisal is "qualified" if it is "conducted by a qualified appraiser in accordance with generally accepted appraisal standards" and meets requirements set forth in "regulations or other guidance prescribed by the Secretary."  § 170(f)(11)(E)(i).  In the case of a partnership or S corporation, the qualified appraisal requirements "shall be applied at the entity level."  § 170(f)(11)(G).  Accordingly, we must determine whether Oconee met these requirements for its contribution of the conservation easement.

To be a "qualified appraiser," an individual must have "earned an appraisal designation from a recognized professional appraiser organization or ha[ve] otherwise met minimum education and experience requirements set forth in the regulations prescribed by the Secretary."  § 170(f)(11)(E)(ii)(I).  The individual must "regularly perform[] appraisals for which [he] receives compensation" and must meet "such other requirements as may be prescribed by the Secretary."  § 170(f)(11)(E)(ii)(II) and (III).  The appraiser also must "demonstrate[] verifiable education and experience in valuing the type of property subject to the appraisal."  § 170(f)(11)(E)(iii)(I).

Respondent agrees that Messrs. Wingard and Van Sant met these general requirements at the time they prepared the final appraisal in April 2016.  However, respondent contends that Messrs. Wingard and Van Sant were not qualified appraisers by virtue of the "Exception" set forth in Treasury Regulation § 1.170A-13(c)(5)(ii).  It provides that an individual is not a qualified appraiser with respect to a particular donation "if the donor had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property."  This will be true, for example, if "the donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property."  *Ibid.*

The "knowledge" requirement in Treasury Regulation § 1.170A-13(c)(5)(ii) implicates the donor's actual and/or constructive knowledge.  *See Dunlap v. Commissioner*, T.C. Memo. 2012-126, 103 T.C.M. (CCH) 1689, 1708 (considering whether the information the donor knew or

**[\*40]** should have known would cause a reasonable person to believe that the appraiser would falsely overstate the value of an easement). In gauging a partnership's "knowledge" for this purpose, we look to the knowledge of the person(s) with ultimate authority to manage the partnership. *See, e.g.*, *CNT Invs., LLC v. Commissioner*, 144 T.C. 161, 222 (2015) (examining the knowledge possessed by the general partner in order to assess "good faith"); *Superior Trading, LLC v. Commissioner*, 137 T.C. 70, 91–92 (2011) (stating that partnership-level defenses take "into account the state of mind of the general partner"), *supplemented by* T.C. Memo. 2012-110, *aff'd*, 728 F.3d 676 (7th Cir. 2013). The Reynoldses (through intervening entities) were the ultimate managers of Oconee and Oconee Investors. Thus, in determining what facts were "known" by Oconee, we must determine what facts were known—actually or constructively—by the Reynoldses.

During 2013–2015 the Reynoldses persistently marketed the Parent Tract to prospective buyers. In 2013 they offered the Parent Tract to TPA for $7.9 million, but TPA rejected that offer. The Reynoldses then commissioned a new DCF analysis valuing the Parent Tract at $6.7 million; according to Mr. Denbow, $6.7 million "became the new asking price." In September 2013 the Reynoldses offered the Parent Tract to TPA at $6.7 million, but TPA again declined. During 2015 the Reynoldses authorized Mr. Baker to sell the entire Parent Tract at $7.7 million. Only one prospective buyer expressed interest, and no deal was consummated.

On the basis of these facts, we conclude that the Reynoldses knew that the Parent Tract in 2015 was worth considerably less than $10 million. They may have believed that the property had considerable intrinsic value and might ultimately be developed into the Reynoldsboro of their dreams. But they were shrewd, experienced, and highly sophisticated real estate developers. Whatever the property's future potential, they knew that, as of late 2015, the current market value of the Parent Tract was considerably less than $10 million.

The Reynoldses regarded the conservation easement transaction as a substitute for sale of the Parent Tract. Because they could not get their asking price through a sale transaction, they were determined to get proceeds of at least $7 million through the easement transaction. The agreement they executed with the Vola Group explicitly stated that an easement transaction would be consummated only if Carey Station LLC (the Reynoldses' entity) "decide[d] that the net proceeds from conservation easement are acceptable." Throughout the ensuing

[*41] negotiations, the Reynoldses consistently took the position that the proceeds accruing to them would be "acceptable" only if such proceeds exceeded $7 million.

In February 2015, at his initial meeting with Mr. Ciavola, Mr. Novak made clear that, in order for the Reynoldses to derive proceeds of $7 million, the Parent Tract would need to have an appraised value of around $60 million. The next day Mr. Novak supplied an "Estimated Sources and Uses of Funds" schedule showing an "estimated charitable contribution deduction" of $60 million. During the next six weeks SCP provided two similar schedules, both presupposing a charitable contribution deduction of $60 million.

On March 26, 2015, Mr. Ciavola relayed this information to the Reynoldses: "Ricky [Novak] is confident of a range from $40MM-75MM, depending on the appraiser's verbal," and indicated that "we are over $7MM." Mr. Novak expressed confidence in an appraisal of that magnitude even though no appraiser had yet been retained. Mr. Ciavola's confirmation that "we are over $7MM," combined with the $60 million charitable contribution shown on SCP's schedules, made it obvious to the Reynoldses that the Parent Tract would need to be appraised in the neighborhood of $60 million. But the Reynoldses knew that the FMV of the Parent Tract was less than $10 million.

The Reynoldses then sought to lock in an appraised value in the $60 million range. In April 2015 they asked Mr. Pollock to negotiate an arrangement with SCP under which they would not have to proceed with a conservation easement unless the investors, in the aggregate, received a "[m]inimum Charitable Contribution Deduction [of] $60-75M."[12] In August 2015 Mercer notified his children that "[w]e are close to a deal for selling our land to an outside investment group," stating that "the appraisal will be somewhere around $70 million." An appraised value for the Parent Tract in the neighborhood of $60 million was thus baked into the transaction from the outset. Otherwise, the transaction would not occur.

---

[12] That document, executed in May 2015, provided that SCP and the Reynoldses would come to a "[m]utual agreement" during Phase 1 on "the estimated net proceeds" accruing to the Reynoldses and the "minimum equity capital" to be raised from investors. We find that the "mutual agreement" was for the Reynoldses to derive net proceeds of at least $7 million. This agreement required an aggregate charitable contribution deduction in the neighborhood of $60 million, which was discussed and agreed upon before any appraiser had been retained.

**[\*42]** Messrs. Wingard and Van Sant were retained to appraise the Parent Tract in July 2015. In October 2015 Mr. Ciavola emailed Messrs. Novak and Freeman, stating that he was attaching "the additional information you requested." Included among the attachments was a document titled "Market Summary," suggesting a value of $65 million for 890 acres of the Parent Tract, after excluding unspecified "carve-outs." Later that day Messrs. Novak and Freeman forwarded these documents to Messrs. Wingard and Van Sant. These documents made clear to the appraisers—if they did not know it already—the magnitude of appraised value that SCP needed in order for the deal to close.

On November 16 SCP supplied Mr. Ciavola with a new spreadsheet showing an estimated charitable contribution deduction of $57.6 million for an easement on the Parent Tract. SCP noted that the Reynoldses were considering carving out certain parcels and reserving them for future development. If the Reynoldses did this, SCP estimated that it would decrease the overall valuation of the easement by approximately $5 million. Mr. Ciavola forwarded this schedule to the Reynoldses.

The following day Mr. Ciavola arranged a conference call with the Reynoldses and SCP's principals to discuss the "carve-out" problem. On November 18 Mr. Ciavola emailed the Reynoldses a new spreadsheet that he described as having been "revised from last night's discussion." This schedule showed an estimated charitable contribution deduction, before carve-outs, of $60,608,700. Significantly, that figure was within 1% of the $60 million projection Mr. Novak had supplied at his initial meeting with Mr. Ciavola in February 2015. The Reynoldses did, in fact, carve out from the Parent Tract and retain for future development six parcels comprising 82.22 acres. If the carved-out parcels were removed from the Parent Tract before the granting of the easement, the schedule showed a net "estimated charitable contribution deduction" of $52,873,765.

At that point Messrs. Wingard and Van Sant had not yet supplied an appraisal of the Parent Tract. Mr. Ciavola told SCP to "call the appraiser" because the Reynoldses needed a "'verbal' value" in order to proceed with the transaction. Mr. Freeman responded: "We all have the window and need to work within that window. The appraisers are pulling the exact figures together . . . . The window you have is within the ballpark of reality."

[*43] In speaking of "the window we all have," we find that Mr. Freeman was referring to the revised easement numbers discussed during the meeting with the Reynoldses on the evening of November 17—i.e., an estimated charitable contribution deduction of $60.6 million, reduced to $52.8 million after carving 82.22 acres out of the Parent Tract. In stating that this window "is within the ballpark of reality," we find that Mr. Freeman was assuring the Reynoldses that the appraisal would come in fairly close to the latter number. That assurance was enough for the Reynoldses: On November 24, Mr. Ciavola told Mr. Pollock that the Reynoldses were "moving ahead with Phase II," i.e., authorizing SCP to market the conservation easement deal to investors.

On the basis of these facts, we find that the Reynoldses, acting through their intermediaries, had reached a meeting of the minds with Messrs. Wingard and Van Sant that the Parent Tract would be appraised at roughly $60 million (before carve-outs) and fairly close to $52.8 million (after carve-outs). And sure enough it was: On December 3, 2015, Messrs. Wingard and Van Sant provided a "Restricted Appraisal Report" valuing the 874 acres then remaining in the Parent Tract as having a "before value" of $51.7 million and an "easement value" of $50.4 million. That "easement value" was within 5% of the $52.8 million "estimated charitable contribution deduction" Mr. Freeman had projected two weeks previously. Because the Reynoldses knew that the Parent Tract was not worth $51.7 million, but rather was worth less than $10 million, they "had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property." Treas. Reg. § 1.170A-13(c)(5)(ii).

Petitioner argues that the Reynoldses could not have had "knowledge of facts that would cause a reasonable person to expect the appraiser[s] falsely to overstate the value" because there was "no communication" between them and Messrs. Wingard and Van Sant. Mercer testified at trial that he put what might be called a "Chinese Wall" in place to ensure that he and Jamie never communicated with the appraisers directly. Petitioner likewise asserts that no advance agreement could have existed because "respondent was unable to elicit any testimony from any witness that anyone instructed the appraisers as to value." "To the contrary," petitioner says, "the evidence was that all parties were awaiting value determinations by the appraisers before other numbers could be finalized."

We are not persuaded. The "Chinese Wall" supposedly separating the Reynoldses from the appraisers was both transparent and porous.

[*44] We assume arguendo that the Reynoldses never communicated directly with Messrs. Wingard and Van Sant. But there was a daisy chain of intermediaries (i.e., Mr. Ciavola and SCP's principals) who ensured that all critical information was passed back and forth across the chain.

As a result of incessant communications among the Reynoldses, their agents, and the appraisers, a meeting of the minds was reached that the Parent Tract would be appraised (before carve-outs) very close to the $60 million figure that Mr. Novak had given the Reynoldses in February 2015. Contrary to petitioner's view, testimony that someone "instructed the appraisers as to value" was not required. An agreement can arise by virtue of acquiescence in a shared goal as well as by response to an explicit instruction. *See Ahern v. Cent. Pac. Freight Lines*, 846 F.2d 47, 49 (9th Cir. 1988) (holding that the terms of an agreement "can be implied from the circumstances, and conduct inconsistent with a refusal of the terms raises a presumption of assent upon which others may rely" (quoting *Wong v. Bailey*, 752 F.2d 619, 621 (11th Cir. 1985))). An agreement can be confirmed by a wink and a nod as well as by a signature page. *See United States v. Hernandez*, 921 F.2d 1569, 1575 (11th Cir. 1991) (holding that an agreement to conspire may "be proved by circumstantial as well as direct evidence" (quoting *United States v. Burton*, 871 F.2d 1566, 1571 (11th Cir. 1989))).

In support of its position petitioner relies on *Kaufman v. Commissioner*, T.C. Memo. 2014-52, 107 T.C.M. (CCH) 1262, *supplementing* 134 T.C. 182 (2010) *and* 136 T.C. 294 (2011), *aff'd*, 784 F.3d 56 (1st Cir. 2015). Addressing the regulation before us, the Tax Court interpreted the phrase "falsely to overstate" as "intended to convey a sense of collusion and deception as to the value of the property." *Id.*, 107 T.C.M. (CCH) at 1278. That interpretation, we explained, was supported by the regulation's illustrative example (cited above), which hypothesizes that "the donor and the appraiser make an agreement" that the property will be appraised at an inflated value. Treas. Reg. § 1.170A-13(c)(5)(ii). Finding no such agreement or collusion on the facts of *Kaufman*, the Court concluded that the regulation did not operate to render the appraisers in that case nonqualified. *See Kaufman*, 107 T.C.M. (CCH) at 1278.

Petitioner seeks to analogize *Kaufman* to this case, asserting that "there could be no 'collusion' if there was no communication" between the Reynoldses and the appraisers. We have already rejected that argument: Communication can occur directly or can be accomplished indirectly through agents and intermediaries. "Collusion" simply means

[*45] a "secret agreement or cooperation," especially for an improper purpose. *See Collusion, Webster's Collegiate Dictionary* (9th ed. 1984). We have found that there was a meeting of the minds between the Reynoldses and the appraisers—i.e., a "secret agreement"—that the Parent Tract would be appraised (before carve-outs) in the neighborhood of $60 million. And this agreement was made for an improper purpose, i.e., to secure grossly inflated tax deductions for the Reynoldses, the promoters, and the investors.

In sum, the Reynoldses at year-end 2015 knew the Parent Tract was worth less than $10 million, having recently offered it for sale (unsuccessfully) at prices between $6.7 million and $7.9 million. Yet through their intermediaries they reached a meeting of the minds with Messrs. Wingard and Van Sant that the Parent Tract would be appraised (before carve-outs) in the neighborhood of $60 million. The facts here fit squarely within the example set forth in the regulation, where "the donor and the appraiser make an agreement concerning the amount at which the property will be valued and the donor knows that such amount exceeds the fair market value of the property." Treas. Reg. § 1.170A-13(c)(5)(ii). Because the Reynoldses "had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property," *ibid.*, Messrs. Wingard and Van Sant were not "qualified appraisers" with respect to this particular donation. Their final appraisal, which was attached to Oconee's return, was thus not a "qualified appraisal" as required by section 170(f)(11)(E)(i).[13]

In certain cases, failure to secure a "qualified appraisal" may be excused. Section 170(f)(11)(A)(ii)(II) provides that a charitable contribution deduction will not be disallowed "if it is shown that the failure to [secure a qualified appraisal] is due to reasonable cause and not to willful neglect." *See Belair Woods, LLC v. Commissioner*, T.C. Memo. 2018-159, 116 T.C.M. (CCH) 325, 330. We have construed section

---

[13] Petitioner contends that, even if "there were some technical defect," Oconee should still be entitled to its charitable contribution deduction because it "substantially complied" with the requirements of section 170 and the regulations thereunder. *Cf. Bond v. Commissioner*, 100 T.C. 32, 42 (1993). We disagree. As we have previously held, obtaining an appraisal from a nonqualified appraiser does not constitute substantial compliance. *See Alli v. Commissioner*, T.C. Memo. 2014-15, 107 T.C.M. (CCH) 1082, 1095 (citing *D'Arcangelo v. Commissioner*, T.C. Memo. 1994-572, 68 T.C.M. (CCH) 1223, 1230). The Reynoldses cannot be deemed to have "substantially complied" with the regulations when they achieved an advance agreement with the appraisers that the Parent Tract would be overvalued.

**[\*46]** 170(f)(11)(A)(ii)(II) similarly to other Code sections that provide for "reasonable cause" defenses. *See Presley v. Commissioner*, T.C. Memo. 2018-171, 116 T.C.M. (CCH) 387, 402, *aff'd*, 790 F. App'x 914 (10th Cir. 2019); *Crimi v. Commissioner*, T.C. Memo. 2013-51, 105 T.C.M. (CCH) 1330, 1353. Reasonable cause requires that a taxpayer "have exercised ordinary business care and prudence." *Crimi*, 105 T.C.M. (CCH) at 1353 (citing *United States v. Boyle*, 469 U.S. 241 (1985)). If a taxpayer alleges reliance on professional advice, he must show that he "actually relied in good faith on the professional's advice." *Id.*; *see Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 98–99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

Petitioner contends that the Reynoldses had "reasonable cause" for failure to secure a qualified appraisal because they "relied on an accountant and the ongoing tax advice of a law firm at the time of the appraisal." But the record establishes that the Reynoldses, acting through their agents, reached an advance agreement with Messrs. Van Sant and Wingard that the Subject Property would be significantly overvalued. There is no evidence that any lawyer or accountant opined that the Parent Tract was actually worth $60 million. Even if they had, the Reynoldses could not reasonably have relied on that advice because they knew that the Parent Tract at year-end 2015 was worth less than $10 million. *See* Treas. Reg. § 1.6664-4(c)(1)(ii) (stating that, for reliance on professional advice to constitute reasonable cause, "the advice must not be based upon a representation or assumption which the taxpayer knows, or has reason to know, is unlikely to be true"); *see also Exelon Corp. v. Commissioner*, 906 F.3d 513, 529 (7th Cir. 2018), *aff'g* 147 T.C. 230 (2016); *Blum v. Commissioner*, 737 F.3d 1303, 1318 (10th Cir. 2013), *aff'g* T.C. Memo. 2012-16.

In short, the reason the appraisal is "nonqualified" is not some minor defect or technical flaw, a matter about which a taxpayer might sensibly trust professional advice. The appraisal is nonqualified because the Reynoldses "had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property." Treas. Reg. § 1.170A-13(c)(5)(ii). A person who achieves an advance agreement with an appraiser that property will be overvalued—knowing that it is being overvalued—cannot establish good

**[\*47]** faith reliance on professional advice that the appraisal is acceptable.[14]

### C. *Application of Section 170(e)(1)*

#### 1. *General Rules*

Section 170(e)(1)(A) provides that a deduction otherwise allowable for a contribution of property shall be reduced by "the amount of gain which would not have been long-term capital gain . . . if the property contributed had been sold by the taxpayer at its fair market value (determined at the time of such contribution)." Inventory held primarily for sale to customers in the regular course of a trade or business is "ordinary income property." No portion of the gain from the sale of such property can be long-term capital gain. *See* § 1221(a)(1).

For these reasons, the deduction for a contribution of "ordinary income property" is typically limited to the donor's cost or adjusted basis in the property. *See Jones v. Commissioner*, 560 F.3d 1196, 1199 (10th Cir. 2009), *aff'g* 129 T.C. 146 (2007); *Strasburg v. Commissioner*, T.C. Memo. 2000-94, 79 T.C.M. (CCH) 1697, 1704 ("The allowable charitable contribution deduction for ordinary income property is limited to the basis of the property donated."). Thus, if a taxpayer has a zero basis in "ordinary income property," section 170(e)(1)(A) "require[s] that the deduction for donating that property be reduced by the property's *entire* value—leaving the taxpayer with no deduction at all." *Jones v. Commissioner*, 560 F.3d at 1199; *see Lary v. United States*, 787 F.2d 1538, 1540–41 (11th Cir. 1986); *Conner v. Commissioner*, T.C. Memo. 2018-6, 115 T.C.M. (CCH) 1013, 1023, *aff'd*, 770 F. App'x 1016 (11th Cir. 2019).

Property contributed to a partnership generally retains the same character it had in the hands of the contributing partner. Section 724(b) provides that, if property is contributed by a partner to a partnership, and if the property "was an inventory item in the hands of such partner immediately before such contribution," then "any gain or loss recognized

---

[14] In its opening post-trial brief petitioner asserted that the regulations governing qualified appraisals and qualified appraisers "did not go through a proper notice-and-comment process and are, therefore, invalid." That assertion occupied a single sentence; petitioner supplied no argument in support of that assertion, stating that "the Court need not reach that issue in this case." And in its post-trial Answering Brief petitioner did not mention any challenge to the validity of Treasury Regulation § 1.170A-13(c)(5)(ii), or any other provision of the regulations, based on the Administrative Procedure Act (APA). Under these circumstances, petitioner has not properly presented or preserved an APA challenge to any regulation discussed in this Opinion.

**[\*48]** by the partnership on the disposition of such property during the 5-year period beginning on the date of such contribution shall be treated as ordinary income or ordinary loss." Section 724(b) was enacted to prevent a partner from converting "ordinary income property" into capital gain property simply by contributing it to a partnership. *See Jones v. Commissioner*, 560 F.3d at 1199; *Strasburg*, 79 T.C.M. (CCH) at 1704.

Section 751(d) defines "inventory items" for section 724(b) purposes to include "property of the partnership of the kind described in section 1221(a)(1)." *See* § 724(d)(2) (incorporating the definition of "inventory item" provided in section 751(d)). Section 1221(a)(1) sets forth an exclusion from the term "capital asset," providing that a capital asset does not include "stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory . . . or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Thus, if the contributing partner holds property primarily for sale to customers in the ordinary course of its trade or business, the property is an "inventory item" in its hands and in the hands of the partnership to which it contributes the property.

Whether a taxpayer holds property primarily for sale to customers in the ordinary course of its business, rather than as an investment, presents a question of fact. *Pritchett v. Commissioner*, 63 T.C. 149, 162 (1974). The U.S. Court of Appeals for the Eleventh Circuit has explained that this factual question involves three subsidiary inquiries: (1) whether the taxpayer was engaged in a trade or business; (2) whether the taxpayer held the property primarily for sale in that business; and (3) whether the sales thus contemplated were "ordinary" in the course of that business. *Sanders v. United States*, 740 F.2d 886, 888–89 (11th Cir. 1984) (citing *Suburban Realty Co. v. United States*, 615 F.2d 171, 178 (5th Cir. 1980)).[15] Absent stipulation to the contrary this case is appealable to the Eleventh Circuit, and we thus follow its precedent. *See* § 7482(b)(1)(E); *Golsen v. Commissioner*, 54 T.C. 742, 756–57 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

The Eleventh Circuit has identified several factors that may be relevant in this inquiry: (1) the nature and purpose of the property's acquisition and the duration of the taxpayer's ownership; (2) the extent of the taxpayer's efforts to sell the property; (3) the number, extent,

---

[15] Decisions from the U.S. Court of Appeals for the Fifth Circuit issued before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

[*49] continuity, and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for sale of the property; (6) the degree of supervision exercised by the taxpayer over any broker hired to sell the property; and (7) the time and effort the taxpayer habitually devoted to the sales activity. *Boree v. Commissioner*, 837 F.3d 1093, 1100 (11th Cir. 2016) (citing *United States v. Winthrop*, 417 F.2d 905, 909–10 (5th Cir. 1969)), *aff'g in part, rev'g in part* T.C. Memo. 2014-85; *see Sanders*, 740 F.2d at 889 (applying the *Winthrop* factors). No single factor or combination of factors is controlling, and "great weight" may be given to other relevant factors where appropriate. *See Boree v. Commissioner*, 837 F.3d at 1105. Each case must be decided on its particular facts. *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 415 (5th Cir. 1976) (citing *Thompson v. Commissioner*, 322 F.2d 122, 127 (5th Cir. 1963), *aff'g in part, rev'g in part* 38 T.C. 153 (1962)).

## 2. *Tax Character of the Subject Property*

The Reynoldses were real estate developers. In 2003 Jamie and Reynolds Partners (controlled by Mercer)) each acquired a 50% interest in the Parent Tract. At all times between 2003 and 2014 they held the Parent Tract (including the Subject Property) for sale to customers in the ordinary course of their real estate business.

The Reynoldses commissioned maps and surveys of the Parent Tract and considered various options for developing it. They eventually settled on a conceptual mixed-use development plan for a community to be called Reynoldsboro, consisting of one or more "town centers" surrounded by homes. In 2006 they submitted a proposed development plan to Greene County, identifying a mixture of high-density residential, low-density residential, commercial, and recreational uses. The county approved the plan and zoned the entire Parent Tract (including the Subject Property) as CPUD. By 2007 the Reynoldses had installed on portions of the Parent Tract paved and unpaved roads, wastewater and potable water access points, and utility access points.

Between 2007 and 2014 the Reynoldses persistently marketed the Parent Tract, using a marketing package created by Messrs. Kelly and Denbow. Their goal was to find a joint venture partner that would provide capital to assist them in bringing Reynoldsboro to life. In late 2012 Mercer initiated negotiations with Phoenix Capital which resulted in an offer and a counteroffer but no deal. In 2013 the Reynoldses made an offer to TPA, again seeking a joint venture partner to develop the Parent

**[\*50]** Tract. Those negotiations resulted in two offers and a counteroffer, but again no deal.

While seeking a joint venture partner for the entire Parent Tract, the Reynoldses sold portions of it to various buyers, generally with a view to facilitating amenities that would be synergistic with their hoped-for development. Between 2003 and 2012 they sold six parcels out of the Parent Tract, totaling 95.53 acres, to be used (among other things) for the construction of a fire station, a church, a school, a skilled nursing/assisted living facility, and a residential community to be developed by Del E. Webb. The Reynoldses derived proceeds of $2,671,300 from three of these sales; the record does not enable us to determine the sale prices for the other three parcels.

Between February and June 2014, the Reynoldses sold another four parcels out of the Parent Tract, totaling 60.6 acres. One of these sales, to Carey Station Communities (15.43 acres), was for the construction of the Traditions residential community, which was jointly developed and operated by the Reynoldses and TPA. The Reynoldses derived aggregate proceeds of $1,012,415 from these sales. They reported the profit from all of the 2014 sales as ordinary income on their Federal income tax returns.[16]

On the basis of these facts, we find that Jamie Reynolds and Reynolds Partners (controlled by Mercer Reynolds) held their respective 50% interests in the Parent Tract for sale to customers in the ordinary course of their real estate development business. Several factors listed as relevant by the Eleventh Circuit—plus an additional factor, to which we give great weight—point inescapably to that conclusion:

- The Reynoldses acquired the Parent Tract for development, held the Tract for 11 years, and completed plans to develop it as a mixed-use residential community. They submitted a development plan to Greene County for approval and received the CPUD zoning they requested. *See Boree v. Commissioner*, 837 F.3d at 1100 (deeming relevant "the nature and purpose of the

---

[16] The 2014 returns on which these sales were reported were filed by Jamie Reynolds and Reynolds Partners, which Mercer controlled. Petitioner did not submit into evidence any tax returns filed by the Reynoldses or their affiliated entities for years before 2014. In the absence of such evidence, we assume that the profits realized from earlier sales of parcels carved from the Parent Tract, which occurred between 2003 and 2012, were likewise reported as ordinary income on the relevant Federal income tax returns.

[*51] acquisition of the property and the duration of the ownership" (quoting *Winthrop*, 417 F.2d at 910)).

- The Reynoldses persistently marketed the entire Parent Tract on the basis of DCF analyses prepared by their staff. From late 2012 through early 2014 they engaged in lengthy negotiations with Phoenix Capital and TPA seeking a joint venture partner to develop the Parent Tract. Despite several rounds of offers and counteroffers, no deal was reached. As Mr. Denbow testified, $6.7 million "became the new asking price" after TPA rejected the Reynoldses' first offer. *See ibid.* (deeming relevant "the extent and nature of the taxpayer's efforts to sell the property" (quoting *Winthrop*, 417 F.2d at 910)).

- The Reynoldses sold ten parcels out of the Parent Tract, generally with a view to enhancing prospects for development of the entire Tract. These sales were substantial, involving 156.13 acres and generating sale proceeds in excess of $3.6 million. The "frequency and substantiality" of sales is the "most important" factor in determining the tax character of property. *Boree v. Commissioner*, 837 F.3d at 1100 (quoting *Biedenharn Realty*, 526 F.2d at 416); *see Suburban Realty*, 615 F.2d at 178 ("[T]he presence of frequent sales ordinarily belies the contention that property is being held 'for investment' rather than 'for sale.'").[17]

- The Reynoldses did initial infrastructure work on the Parent Tract, adding paved and unpaved roads, wastewater and potable water access points, and utility access points. They commissioned a master sewer plan from an engineering firm and a conceptual land use plan showing proposed roadways, residential communities, and proposed commercial development. They created a marketing package for the Parent Tract that was "selectively distributed" to potential joint-venture partners. Such development and marketing activities indicate that the taxpayer is engaged in a real estate business and holds land for sale rather than for investment. *See Boree v. Commissioner*, 837 F.3d at 1100 (deeming

---

[17] Petitioner argues that the ten parcels sold—constituting roughly 15% of the Parent Tract—represented an "insubstantial" portion of the whole. Eleventh Circuit precedent does not support that assertion. *See Major Realty Corp. & Subs v. Commissioner*, 749 F.2d 1483, 1488 (11th Cir. 1985) (ruling that sale of parcels amounting to 16% of a larger tract indicates that the tract was held for sale), *aff'g in part, rev'g in part* T.C. Memo. 1981-361. In any event, the failure to sell more acreage was not for lack of trying, as explained in the text.

[*52]  relevant "the extent of subdividing, developing, and advertising to increase sales" (quoting *Winthrop*, 417 F.2d at 910)); *see Suburban Realty*, 615 F.2d at 178–79.

- The Reynoldses conducted their sales activity directly and through office staff employed by their affiliated real estate entities. *See Boree v. Commissioner*, 837 F.3d at 1100 (deeming relevant "the use of a business office for the sale of the property" (quoting *Winthrop*, 417 F.2d at 910)).

- Finally, when Jamie and Reynolds Partners sold portions of the Parent Tract, they reported those sales on their Federal income tax returns as generating ordinary income, not long-term capital gain. Statements on tax returns may generally be treated as admissions by the taxpayer. *See Mendes v. Commissioner*, 121 T.C. 308, 312 (2003). We place great weight on this reporting, which shows that the Reynoldses (and their entities) regarded the Parent Tract as being held for sale to customers in the ordinary course of their real estate business. *See Boree v. Commissioner*, 837 F.3d at 1105 ("[T]he [taxpayers] deducted expenses related to the property . . . , a practice inconsistent with capital gains treatment . . . ."); *Glade Creek Partners, LLC v. Commissioner* (*Glade Creek Partners II*), T.C. Memo. 2023-82, at *14 ("In the light of section 724(b) and its purpose, we place great weight on [the taxpayer's] reporting of the easement property as inventory.").

In fall 2014 the Reynoldses formed Carey Station LLC, which is treated as a partnership for Federal income tax purposes. They contributed to Carey Station LLC roughly 980 acres of the Parent Tract, including the Subject Property. Because that acreage was an "inventory item" in the Reynoldses' hands, section 724(b) dictates that it remained an "inventory item" in the hands of Carey Station LLC.

During 2015 Carey Station LLC continued to hold the 980 acres (including the Subject Property) as "ordinary income property." In December 2014 it carved a 15.63-acre parcel out of the Parent Tract and sold it to Good Samaritan Hospital for $1,049,262. As required by section 724(b), Carey Station LLC reported its profit from that sale as ordinary income on the Form 1065 it originally filed for 2014.[18]

_____

[18] In June 2016 Mr. Ciavola sent Mr. Pollock an email outlining several "open items," including a "2014 amended return classifying property as held for investment

[*53] In early 2015 Mr. Baker, a real estate broker, was authorized to offer for sale, with an asking price of $7.7 million, the 980 acres held by Carey Station LLC. He advertised the property for sale and asked interested buyers to call him. He was contacted by a prospective buyer, who was given a thorough tour of the Parent Tract and introduced to the Reynoldses to discuss a possible purchase of the property.

On the basis of these facts, we find that the 980 acres held by Carey Station LLC (including the Subject Property) was "ordinary income property" in its hands. On December 21, 2015, Carey Station LLC contributed the Subject Property to Oconee, which is treated as a partnership for Federal income tax purposes. Under section 724(b), the Subject Property was thus "ordinary income property" in Oconee's hands. *Cf. Jones v. Commissioner*, 560 F.3d at 1199; *Mill Road 36 Henry, LLC v. Commissioner*, T.C. Memo. 2023-129, at *51–54 (applying section 724(b) in the context of a syndicated conservation easement transaction); *Glade Creek Partners II*, T.C. Memo. 2023-82, at *8, *15 (same); *Strasburg*, 79 T.C.M. (CCH) at 1704.

Petitioner advances two main arguments against this conclusion. First, it asserts that the Parent Tract from 2003 to 2014 was "investment property" in the hands of Jamie Reynolds and Reynolds Partners, and that the 980 acres they contributed to Carey Station LLC retained this "investment" character. According to petitioner, Jamie and Reynolds Partners were not in the "development business" but relied on affiliated entities (such as Linger Longer) to do the hands-on development and construction work. Alternatively, they contend that the Parent Tract was converted to "investment property" after 2011, when Reynolds Plantation went into receivership. That is supposedly so because the Reynoldses, owing to the financial crisis and lack of funding, allegedly abandoned at that point their intent to develop the Parent Tract.

We are not persuaded. The record leaves no doubt that Jamie Reynolds and Reynolds Partners were engaged in the real estate

and not dealer inventory." On April 4, 2016, Carey Station LLC had submitted to the IRS an amended Form 1065 for 2014 reporting that its income from the sale of 15.63 acres to Good Samaritan Hospital was not ordinary income, as originally reported, but rather was long-term capital gain. We find that the reporting of this transaction on the amended return was erroneous and self-serving—being designed to backstop the inflated charitable contribution deductions about to be claimed by the PropCos—and we give it no weight. As discussed in the text, we find that Carey Station LLC at all times held the Parent Tract (including the Subject Property) for sale to customers, not for investment.

[*54] development business. The Reynoldses and their associates created dozens of distinct entities to conduct their real estate activities—holding companies, investment companies, development companies, and construction companies. In determining the tax character of the Parent Tract, it is immaterial which of these entities ultimately performed the development and construction work. The critical question is whether *the owners* of the Parent Tract held that land for sale to customers in the ordinary course of their real estate business. Jamie Reynolds and Reynolds Partners were the owners of the Parent Tract, and the facts establish that they held this land for sale to customers from 2003 onwards.[19]

Nor are we persuaded by petitioner's assertion that the Reynoldses converted the Parent Tract to "investment property" in 2011. The Reynoldses, at that point, may have had insufficient capital to develop the entirety of the Parent Tract on their own. That is why they focused their marketing activities during 2012–2014 on a search for *a joint venture partner*. Their concept was that they would provide the land, the new partner would provide much of the capital, and the development activities would be undertaken jointly. This is precisely the pattern they followed in May 2014, when they sold a 15.43-acre piece of the Parent Tract to Carey Station Communities. That joint venture was owned 50%/50% by entities controlled by the Reynoldses and TPA. The Reynoldses and TPA together developed that property as Traditions, a residential subdivision targeted to first-time home buyers.

Finally, assuming arguendo that the Subject Property was "ordinary income property" in Oconee's hands, petitioner urges that a different conclusion applies to *the easement*. The easement, petitioner emphasizes, was the subject of the charitable contribution, and it was not "held for sale to customers." Indeed, petitioner urges that section 170(e)(1) cannot possibly apply to the contribution of a conservation

---

[19] In August 2016 the Morris firm prepared, and Mr. Pollock signed, an opinion letter discussing the easement transaction. That opinion relied on factual representations set forth in a "closing certificate" prepared by the Reynoldses or their agents. The closing certificate included the representation that "[t]he Property Owner [Oconee] does not hold any portion of the [Subject] Property for sale to customers in the ordinary course of business." This representation was incorrect insofar as it suggested that the Subject Property was not ordinary income property in Oconee's hands. Because this representation was incorrect, the opinion can offer no support for petitioner's position regarding the application of section 170(e)(1).

**[\*55]** easement:  Because an easement does not constitute physical property, it is not the type of asset normally includible in "inventory."

This argument has little appeal to common sense.  An easement is a real property interest corresponding to a subset of the property rights possessed by Oconee, the fee simple owner.  By way of analogy, suppose that a car dealership has an automobile in inventory and donates the engine to a charity.  The engine, like the car, is surely "ordinary income property"; how could it have been transformed into investment property?  Because the easement was carved from realty that was "ordinary income property" in Oconee's hands, the easement has the same tax character.

And there is no support for petitioner's argument that section 170(e)(1) does not apply when the property donated is an easement.  We have repeatedly held that conservation easement contributions are subject to reduction under section 170(e)(1) where the property on which the easement is granted is ordinary income property.  *See Mill Road 36 Henry, LLC*, T.C. Memo. 2023-129, at \*51–54; *Glade Creek Partners II*, T.C. Memo. 2023-82, at \*8–9 (stating the Court "must determine the character of the easement property" in the donor's hands because its characterization carries over under section 724(b) and any "easement deduction would be limited to [the donor's] adjusted basis" if the easement property was inventory); *Hughes v. Commissioner*, T.C. Memo. 2009-94; *Strasburg*, 79 T.C.M. (CCH) 1697; *Griffin v. Commissioner*, T.C. Memo. 1989-130, *aff'd*, 911 F.2d 1124 (5th Cir. 1990).[20]

In sum, we find that the Parent Tract (including the Subject Property) was at all times "ordinary income property" in the hands of Jamie Reynolds, Reynolds Partners, and Carey Station LLC.  When Carey Station LLC contributed the Subject Property to Oconee, section 724(b) dictated that the Subject Property retained its character as "ordinary income property" in Oconee's hands.  Thus, any charitable contribution

---

[20] The Reynoldses and their agents were fully aware of the risk that section 170(e)(1) might apply here.  The draft and final opinions prepared by the Morris firm devoted four pages to this topic.  And Oconee referenced the application of sections 170(e)(1) and 724(b) in a five-page supplement to the Form 8283 that accompanied its tax return.  It there asserted that the Subject Property "was a 'capital asset' . . . as defined by Code Section 1221(a)" in the hands of Jamie Reynolds, Reynolds Partners, Carey Station LLC, and Oconee, and that, because the Subject Property was supposedly "long-term capital gain property," Oconee was "permitted to claim a deduction for federal income tax purposes in an amount equal to the fair market value (as opposed to the tax basis)."

**[\*56]** deduction attributable to Oconee's grant of a conservation easement is limited by section 170(e)(1)(A) to Oconee's basis in the Subject Property at the time of the donation. *See Jones v. Commissioner*, 560 F.3d at 1199; *Strasburg*, 79 T.C.M. (CCH) at 1704 ("The allowable charitable contribution deduction for ordinary income property is limited to the basis of the property donated.").

### 3. *Basis Limitation Under Section 170(e)(1)*

Petitioner asserts that Carey Station LLC had an adjusted basis of $9,104,937 in the Parent Tract, which allegedly consisted of 963.27 acres at year-end 2014. From these figures petitioner derives a "tax basis per acre" of $9,452. The Subject Property consisted of 355.522 acres. Multiplying that acreage by $9,452 and making a $72,240 adjustment for "Capitalized Property Expenses in 2015," petitioner calculates that Oconee had a tax basis of $3,362,116 in the Subject Property.

Petitioner has supplied no evidence to establish the starting point for this calculation. The $9,104,937 figure is evidently derived from the Form 1065 that Carey Station LLC filed for 2014. On Schedule L it reported "land" with an alleged cost of $9,104,937. But there is no evidence substantiating how this number was derived. An entry on a tax return simply states the taxpayer's position as to an item; it does not constitute evidence. *See Wilkinson v. Commissioner*, 71 T.C. 633, 639 (1979); *Roberts v. Commissioner*, 62 T.C. 834, 837 (1974); *Lenihan v. Commissioner*, T.C. Memo. 2006-259, 92 T.C.M. (CCH) 463, 466 (holding that the cost basis reported by a taxpayer on his Federal tax return was merely a statement of his position, not evidence that his figure was correct).

Proper substantiation of Oconee's adjusted basis in the Subject Property would require a multistep calculation. Petitioner has failed at every step:

- Petitioner has supplied no evidence to show the Reynoldses' acquisition cost for the Parent Tract, consisting of 1,130 acres when purchased in 2003.

- Petitioner has supplied no evidence to establish the downward adjustments to basis required by the Reynoldses' sale of 156.13 acres from the Parent Tract—in 10 distinct transactions between 2003 and 2014—for aggregate consideration exceeding $3.65 million.

[*57] • Petitioner has supplied no evidence to establish the downward adjustment to basis required by Carey Station LLC's sale of 15.63 acres to Good Samaritan Hospital in December 2014, for total consideration of $1,049,262.

• Petitioner has supplied no evidence to show any applicable upward adjustments to basis on account of improvements made to the Parent Tract.

• Petitioner has supplied no evidence to show the downward adjustment to basis required by the Reynoldses' carving out 82.22 acres from the Parent Tract in November 2015 before Carey Station LLC contributed the remaining acreage to the PropCos.

• Petitioner has not established that all acreage remaining in the Parent Tract was 100% fungible, such that a "tax basis per acre" computation could reasonably be used to calculate Oconee's adjusted basis in the Subject Property.

In sum, any charitable contribution deduction to which Oconee would be entitled would be limited to its adjusted basis in the Subject Property. Petitioner has failed to carry its burden of proving that Oconee's basis in the Subject Property exceeded zero. It has thus failed to prove its entitlement to a charitable contribution deduction in excess of zero. *See Lary*, 787 F.2d at 1540 (holding that taxpayers were entitled to no charitable contribution deduction under section 170(e)(1)(A) when they failed to prove that the donated property was long-term capital gain property and failed to substantiate their basis); *Better Beverages, Inc. v. United States*, 619 F.2d 424, 428 n.4 (5th Cir. 1980) ("Where the taxpayer fails to carry this burden to prove a cost basis in the item in question, the basis utilized by IRS . . . must be accepted even where, as here, the IRS has accorded the item a zero basis." (citing *Coloman v. Commissioner*, 540 F.2d 427, 429–31 (9th Cir. 1976), *aff'g* T.C. Memo. 1974-78)).

II. *Valuation*

We have held that Oconee for 2015 is entitled to a charitable contribution deduction of zero. But the proper valuation of the easement is relevant in determining the penalties to which it may be subject. On its 2015 return, Oconee valued the easement at $20.67 million. It based that valuation on the assertion that the "before value" of the Subject Property was $21.2 million, or $59,718 per acre. We now consider the reasonableness of that valuation.

**[\*58]** A.    *Valuation Principles*

The allowable deduction for a charitable contribution of property is generally the FMV of the property on the date it is contributed. Treas. Reg. § 1.170A-1(a), (c)(1). The regulations define FMV as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." *Id.* para. (c)(2). Valuation is not a precise science, and the value of property on a given date is a question of fact to be resolved on the basis of the entire record. *See Kaplan v. Commissioner*, 43 T.C. 663, 665 (1965).

To support their respective positions on the value of the easement, the parties retained experts who testified at trial. We assess an expert's opinion in the light of his or her qualifications and the evidence in the record. *See Parker v. Commissioner*, 86 T.C. 547, 561 (1986). When experts offer competing opinions, we weigh them by examining the factors the experts considered in reaching their conclusions. *See Casey v. Commissioner*, 38 T.C. 357, 381 (1962).

We are not bound by an expert opinion that we find contrary to our judgment. *Parker*, 86 T.C. at 561. We may accept an expert's opinion in toto or accept aspects of his or her testimony that we find reliable. *See Helvering v. Nat'l Grocery Co.*, 304 U.S. 282, 295 (1938); *Boltar, L.L.C. v. Commissioner*, 136 T.C. 326, 333–40 (2011) (rejecting expert opinion that disregards relevant facts). And we may determine FMV from our own examination of the record evidence. *See Silverman v. Commissioner*, 538 F.2d 927, 933 (2d Cir. 1976), *aff'g* T.C. Memo. 1974-285.

The parties agree that the easement should be valued by calculating the difference between the FMV of the Subject Property before and after Oconee granted the easement—commonly referred to as the "before and after" method. In deciding the "before value," we must take into account not only the actual use of the Subject Property at year-end 2015, but also its HBU. *See Stanley Works & Subs. v. Commissioner*, 87 T.C. 389, 400 (1986); Treas. Reg. § 1.170A-14(h)(3)(i) and (ii). A property's HBU is the most profitable use for which it is adaptable and needed, or likely to be needed in the reasonably near future. *Olson v. United States*, 292 U.S. 246, 255 (1934); *Symington v. Commissioner*, 87 T.C. 892, 897 (1986). If different from the current use, a proposed HBU thus requires both "closeness in time" and "reasonable probability." *Hilborn v. Commissioner*, 85 T.C. 677, 689 (1985).

[*59]  B.    *Highest and Best Use*

We have defined HBU as "[t]he reasonably probable and legal use of vacant land or an improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value." *Whitehouse Hotel Ltd. P'ship v. Commissioner*, 139 T.C. 304, 331 (2012) (quoting Appraisal Institute, *The Appraisal of Real Estate* 277 (13th ed. 2008)), *supplementing* 131 T.C. 112 (2008), *aff'd in part, vacated in part and remanded*, 755 F.3d 236 (5th Cir. 2014).  Petitioner's experts, following the lead of Messrs. Wingard and Van Sandt, determined that the HBU of the Subject Property was "immediate development as a mixed-use residential community."  The specific HBU they posited was a 1,012-unit residential subdivision on 162.1 acres of the Subject Property, as laid out in Mr. McAllister's 2022 land use plan.  By contrast, respondent's expert, Mr. Driggers, concluded that a developer could not plausibly begin a development of this size immediately, but would need to hold the 355-acre tract "for seven to ten years" before full-scale development would become financially feasible.  Mr. Driggers accordingly determined that the HBU of the Subject Property was a "speculative hold for future mixed-use development."  On this threshold point we agree with respondent.

In reaching his HBU conclusion, Mr. Driggers relied on the physical characteristics of the Subject Property and existing market conditions.  He determined that the real estate market in Greene County, as of December 2015, was "still in recovery mode from the Great Recession."  In the near term, it could not absorb a new subdivision with the number of units and high price points envisioned by petitioner's experts.  During 2015 one-third of all residential real estate sales in the Lake Oconee area involved property with lake frontage, access to golf courses, or both.  Mr. McAllister's proposed 1,012-unit development offered neither.

Mr. Driggers reasonably concluded that the supply of real estate available for residential development in Greene County vastly exceeded the demand.  He analyzed the supply by focusing chiefly on the existing residential communities near Lake Oconee—including Traditions, Del E. Webb, and Reynolds Lake Oconee (formerly Reynolds Plantation, now owned by MetLife).  The developers of all three communities were sophisticated and well capitalized, and collectively they controlled 1,527 acres of developable land immediately adjacent to the Subject Property.

**[\*60]** Mr. Driggers estimated that at least 1,600 additional homesites could be constructed on this acreage alone.[21]

Greene County issued only 203 new residential housing permits in 2014 and only 224 in 2015. Assuming that permits would continue to be issued at this pace (or slightly faster), Mr. Driggers estimated that it would take at least seven years to absorb the homesites that the existing communities already had available, without even considering the additional supply of 1,012 units that petitioner's experts envisioned for the Subject Property. Mr. Driggers reasonably viewed a seven-year absorption period as the best-case scenario. This is consistent with his conclusion that the HBU of the Subject Property was a speculative hold for future development.[22]

Mr. Driggers' HBU determination, and the reasoning he adduced to support it, mirror the conclusions that CBRE reached in its 2011 and 2014 appraisals of the Parent Tract. CBRE prepared these appraisals for PNC Bank, which held a mortgage loan on the property. Both appraisals emphasized that the Lake Oconee real estate market had been severely damaged by the Great Recession. They concluded that low demand, coupled with the high supply of vacant land, made near-term development of the Parent Tract unlikely.

---

[21] Petitioner contends that Mr. Driggers, in determining the HBU, "ignored evidence that development in the area had already started and was continuing"—an apparent reference to Traditions. But Mr. Driggers clearly considered in his analysis the ongoing development of Traditions—which was proceeding at a very modest pace—and the other existing communities. The Del E. Webb community sold 31 new homes in 2015. Traditions sold its first 6 homes in 2015, sold another 10 homes in 2016, and had 26 homesites available for sale as of January 2017. This is not what one would call a tidal wave of development.

[22] Petitioner relies on a 2006 "Market Analysis," prepared by a Reynolds-affiliated entity, that was submitted to Greene County in connection with the proposed Reynoldsboro subdivision. That analysis projected that mixed-use development was imminent and that absorption of all homesites would occur over ten years (i.e., by 2016). Needless to say, that did not come close to happening. Petitioner seems to infer that Greene County, by granting CPUD zoning as requested by the Reynoldses, agreed with their projections about the imminence and profitability of full-scale development. There is no logical basis for that inference: The zoning approval simply indicated that the proposed development complied with the county's ordinance and was legally permissible. In any event, that report was prepared in 2006, setting forth the Reynoldses' optimistic view of the housing market at its 2006 peak, before the Great Recession caused real estate prices to crash. The 2006 report has no relevance in assessing the relevant supply/demand factors at year-end 2015.

**[*61]** The 2011 CBRE appraisal explained that "[t]he determination of financial feasibility is dependent primarily on the relationship of supply and demand." It noted that four established residential communities already existed near the Parent Tract, each with large amounts of developable land. All four had available homesites with lakefront access and/or golf courses. The Parent Tract, which lacked these favorable attributes, would have to contend with these established communities in a market that CBRE called "competitive." Indeed, CBRE was aware of several development projects that "were slated to resume when economic conditions improve." All in all, CBRE concluded that "it would be financially feasible to complete a new mixed-use project when economic conditions improve," but only if the price of the Parent Tract "was low enough to provide an adequate developer's profit."

CBRE reached essentially the same conclusions about the local real estate market in 2014. Its June 2014 appraisal of the Parent Tract determined that the Lake Oconee market, which mainly targeted "2nd home buyers and regional retirees," had been "hit very hard by the financial downturn of 2008 and has yet to recover significantly." It found that development "has been slow to recover" because of "the low level of sales that has taken place for the existing [housing] stock." CBRE concluded that potential buyers of land, "specifically large tracts of mixed-use and residential land" like the Parent Tract, would likely be "investors or developers well positioned to hold the property until the market recovers in the future to a level which warrants substantial additions in terms of housing supply."[23]

The record supports CBRE's and Mr. Driggers' conclusion that immediate development of the Subject Property was not financially feasible. When MetLife acquired Reynolds Lake Oconee (formerly Reynolds Plantation) out of receivership, the property it acquired included five parcels comprising 1,392 acres adjacent to the Parent Tract and to the immediate west, south, and east of the Subject Property. As candidates for residential development, these parcels were at least as

---

[23] Petitioner discounts the two CBRE appraisals because they were prepared for a bank that was chiefly interested in whether the Parent Tract would provide sufficient collateral in the event of default. We do not find the reason PNC commissioned the appraisals to be critical. We find these appraisals relevant chiefly for CBRE's candid evaluation of the Lake Oconee real estate market in 2011–2014 and its conclusion that the HBU of the Parent Tract would be "future mixed-use development" to commence "when economic conditions improve." Unlike some experts hired to provide trial testimony, CBRE had no ax to grind, but was simply providing straightforward analysis to a bank.

[*62] plausible as (if not more plausible than) the Subject Property: All five were zoned CPUD or PUD, and all five had lake frontage, frontage along Highway 44, or both. But MetLife determined that other portions of Reynolds Lake Oconee—more distant from the Subject Property—held greater development potential given the current market. And the current market was not strong: Reynolds Lake Oconee (including Reynolds Landing and Great Waters) sold fewer than 200 units between 2012 and 2015, whereas before the Great Recession it typically sold more than 500 units *annually*.

MetLife was not the only entrepreneur with available land. The Del E. Webb community, which occupied 408 acres northwest of the Subject Property, had 104 acres available for development in 2015. It sold 31 new homes in 2015 and had numerous homesites remaining for sale. Traditions, which sold 16 homes during 2015–2016, had 26 remaining homesites available for sale in 2017. And it was expected to expand: Before easements were granted on the Subject Property and the other two parcels, the Reynoldses carved out of the Parent Tract a 16.72-acre parcel and a 32.23-acre parcel adjacent to Traditions to accommodate its future expansion. Ironically, perhaps, any future development of the Subject Property would thus encounter serious competition from the Reynoldses themselves.[24]

In short, at year-end 2015 the Subject Property (comprising 355 acres) was surrounded on three sides by more than 2,000 acres of undeveloped land. Much of this acreage already had CPUD zoning and had desirable features the Subject Property lacked. Most of this acreage was owned by sophisticated, well-capitalized investors who had established reputations as developers of existing communities in the area. Yet all of these developers were taking a decidedly "go slow" approach to development. Given that Greene County had issued only 203 new residential

---

[24] Apart from the acreage owned by existing communities and developers, the two other parcels carved from the Parent Tract—Richland Creek and CS Property—encompassed 519 acres of CPUD-zoned land that was also available for residential development. Petitioner urges that we ignore this additional acreage because conservation easements were granted on those parcels. But the three conservation easements were all granted on the same day—December 31, 2015. In determining the "before value" of the Subject Property, we assume that the other two parcels were not yet encumbered by easements. We accordingly consider the parcels owned by Richland Creek (250 acres) and CS Property (259 acres) in calculating the total acreage of undeveloped CPUD-zoned land adjacent to the Subject Property.

[*63] housing permits in 2014 and only 224 in 2015, that "go slow" approach was surely rational in economic terms.

Petitioner contends that the vast supply of neighboring undeveloped land is irrelevant because the Subject Property would supposedly be developed in a way that filled "a gap in the market that needed to be filled." Petitioner surmises that the 2,000 acres surrounding the Subject Property would likely be developed either into "gated communities," with high price points, or into simple cottages, with very low price points. Mr. McAllister's 1,012-unit development, petitioner says, would shoot for the middle, having as its target demographic "ordinary people" working in the neighborhood, aiming to "supply housing and commercial needs for a more modest market."

We find no factual or logical support for this argument. Petitioner adduced no plausible evidence that there was enough current demand among "ordinary people" in the neighborhood to fill a 1,012-unit development. To the contrary, the evidence established that demand for homes in the Lake Oconee area came chiefly from retirees and second-home buyers, typically residing in Atlanta, its suburbs, or other regional population centers. The recommended price points for residences in Mr. McAllister's proposed development, moreover, ranged from $300,000 to $1.75 million. We are not sure that "ordinary people" in the neighborhood would find these prices compelling.

In any event—and contrary to petitioner's premise—the existing communities in the area had numerous homes and homesites available in this same price range. Traditions, which likewise targeted first-time, middle-class homebuyers, sold homes ranging in price from $244,000 to $338,000 in 2015. Homes in Reynolds Landing ranged in price from $370,000 to $550,000, and homes in Great Waters ranged in price from $163,300 to $432,390. Reynolds Lake Oconee—the premier "gated community" in the area—had some homes priced as high as $3 million but offered others for as little as $200,000.

In short, contrary to petitioner's contention, there was nothing unique about the price points for Mr. McAllister's proposed residences that would immunize them from competition posed by the existing Lake Oconee communities. Surrounded on three sides by more than 2,000 acres of undeveloped land, the Subject Property at year-end 2015 was not a plausible candidate for full-scale development. The record firmly supports Mr. Driggers' conclusion that the HBU of the Subject Property was not immediate development as a 1,012-unit residential complex, but

[*64] rather a "speculative hold for future mixed-use development" once the market could absorb such growth.

In opining to the contrary, Mr. Galphin surmised that immediate development of the Subject Property would be financially feasible because there was an "increasing demand for residential and resulting commercial development," as concluded in Ms. Sward's "market analysis." Mr. Clanton similarly concluded that immediate full-scale development would be financially feasible, making the extraordinary assumption that Ms. Sward's report was "true and accurate." Both experts made the extraordinary assumption that Mr. McAllister's 2022 conceptual land use was legally permissible and would be approved.

Mr. McAllister's report posits the development of 1,012 residential units on 162.1 acres of the Subject Property—a residential density of 6.24 units per acre, twice as dense as Traditions and Del E. Webb, the two densest developments in the area. He offered no opinion concerning the financial feasibility of this conceptual land use plan. And Messrs. Galphin and Clanton did not undertake an in-depth analysis of the Lake Oconee market as it actually existed at year-end 2015. Rather, they based their HBU determination on Ms. Sward's "market analysis," which asserted that development of a mixed-use subdivision at year-end 2015 would have been "successful" because of what she claimed was "strong support for additional housing" in the area. She posited that 962 units could easily be sold within seven years, describing that sales pace as "very conservative" given Mr. McAllister's "high-quality development concept" and "moderate initial pricing floor."

Ms. Sward's "market analysis" left us completely unconvinced. Although she opined that the residences shown in Mr. McAllister's conceptual plan would sell out in seven years, she offered no credible market data to support that opinion. Her report fails to address the actual facts on the ground in Greene County at year-end 2015. She ignores the facts that (1) MetLife and Del E. Webb held 1,500 acres available for development next door to the Subject Property; (2) Traditions had acreage available for development adjacent to the Subject Property and was expected to expand; (3) much of these developers' acreage had desirable features the Subject Property lacked; (4) MetLife declined to develop its acreage adjoining the Subject Property because it regarded other portions of Reynolds Lake Oconee as more marketable; (5) Reynolds Lake Oconee, the premier development in the area, was able to sell (on average) only 50 residential units annually during 2012–2015; and (6) Greene County during 2014–2015 had issued (on average) only 214

[*65] new residential housing permits annually. Ms. Sward's math simply does not work.

Rather than adduce contemporaneous market evidence to support her conclusions, Ms. Sward relied heavily on consumer surveys, sociological data, and housing statistics that post-dated 2015. She described her methodology as including "an interview process with the local and regional real estate professions," "confidential data and analysis from previous work . . . in the market that involved Lake Oconee communities," and "consumer research conducted in 2021 [involving] customers qualified and interested in buying a home at Lake Oconee" or in a similar community. These consumers were asked questions "about their lifestyle, opinions of these communities, types of housing recently purchased," and the sorts of amenities they were seeking when considering the purchase of a second or retirement home. The thrust of her report was that the Lake Oconee area is a desirable destination—with an unmet demand for "village-style communities"—and this desirability helps account for the increase in housing sales and prices for years through 2022.

Ms. Sward's expert report relied extensively on data and information from 2016–2022 to support her conclusions about the real estate market in 2015. The bulk of the consumer research was conducted in 2021, and much of the sales and housing data also postdated 2015. Although we ordered numerous problematic passages stricken from her report, we find that her retrospective approach to valuation biased all of her conclusions and renders the entirety of her "market analysis" unreliable.

At the end of 2015, the immediate development of a 1,012-unit residential community on the Subject Property was an extremely improbable scenario. At best, it would have depended "upon events or combinations of occurrences which, while within the realm of possibility, [have not been] fairly shown to be reasonably probable." *See Esgar Corp. v. Commissioner*, T.C. Memo. 2012-35, 103 T.C.M. (CCH) 1185, 1190 (quoting *Olson*, 292 U.S. at 257), *aff'd*, 744 F.3d 648 (10th Cir. 2014). We will not consider a "potential use" in valuing property if a hypothetical buyer, on the valuation date, would not reasonably have considered that potential use. *Boone Operations Co. v. Commissioner*, T.C. Memo. 2013-101, 105 T.C.M. (CCH) 1610, 1616 (citing *Boltar*, 136 T.C. at 336).

A hypothetical buyer at year-end 2015 would not have considered immediate full-scale development of the Subject Property financially

**[\*66]** feasible. As CBRE explained in its June 2014 appraisal, the most likely "hypothetical buyer" would be a developer or investor "well positioned to hold the property until the market recovers in the future to a level which warrants substantial additions in terms of housing supply." The Reynoldses were real estate developers. The evidence at trial convinced us that, if immediate development of the Subject Property (or other portion of the Parent Tract) were a realistic option, the Reynoldses would have pursued that option, either themselves or in partnership with one of the developers with whom they had negotiated. However, they understood that immediate development was not financially feasible. That is why they opted for a conservation easement transaction as an alternative mechanism for wringing cash out of their investment. We accordingly agree with Mr. Driggers that, at year-end 2015, the HBU of the Subject Property was a speculative hold for future mixed-use development.[25]

C.      *"Before Value" of the Subject Property*

1.      *Sales Comparison Methodology*

We typically consider one or more of three approaches to determine the FMV of real property: (1) the market approach, (2) the income approach, and (3) an asset-based approach. *See Bank One Corp. v. Commissioner*, 120 T.C. 174, 306 (2003), *aff'd in part, vacated in part, and remanded sub nom. J.P. Morgan Chase & Co. v. Commissioner*, 458 F.3d 564 (7th Cir. 2006). Determining which method to apply presents a question of law. *See Chapman Glen Ltd. v. Commissioner*, 140 T.C. 294, 325–26 (2013).

The market approach—often called the "comparable sales" method—is commonly used to value residential property. It determines FMV by considering the sale prices realized for similar properties sold in arm's-length transactions around the same time. *See Estate of Spruill v. Commissioner*, 88 T.C. 1197, 1229 n.24 (1987); *Wolfsen Land & Cattle Co. v. Commissioner*, 72 T.C. 1, 19 (1979). Because no two properties are ever identical, the appraiser must make adjustments to account for

---

[25] Petitioner repeatedly insists that Greene County would have approved Mr. McAllister's 2022 mixed-use development plan. We assume arguendo that it would have done so. But while the county was naturally supportive of economic development, its approval would not indicate the financial feasibility of any particular development proposal or the timeline under which development would occur. The record establishes that there was no demand for large-scale mixed-use development in Greene County as of December 31, 2015.

[*67] differences between the properties (e.g., parcel size and location) and the terms of the comparable sales (e.g., proximity to valuation date and conditions of sale). *See, e.g., Wolfsen Land & Cattle Co.*, 72 T.C. at 19. The solidity of an appraiser's valuation "depends to a great extent upon the comparables selected and the reasonableness of the adjustments made." *Id.* at 19–20.

"In the case of vacant, unimproved property . . . the comparable sales approach is 'generally the most reliable method of valuation . . . .'" *Estate of Spruill*, 88 T.C. at 1229 n.24 (quoting *Estate of Rabe v. Commissioner*, T.C. Memo. 1975-26, *aff'd*, 566 F.2d 1183 (9th Cir. 1977) (unpublished table decision)). Both parties' experts used the comparable sales method to determine the "before value" of the Subject Property. Because the 355-acre tract was vacant and largely unimproved at year-end 2015, and because its HBU was a "speculative hold" for future development, we agree that this approach provides the most reliable tool for determining the "before value."[26]

### 2. *Respondent's Expert*

Given his HBU determination for the Subject Property, Mr. Driggers searched for sales of similarly configured tracts that investors would reasonably view as potential candidates for eventual (but not immediate) mixed-use development, market conditions permitting. He selected sales of seven comparable properties, all in Georgia. Six of these transactions involved properties within 40 miles of the Subject Property (three being located near Greensboro). The sales occurred between February 2012 and November 2015 and involved tracts ranging from 194.4

---

[26] In certain situations the "subdivision method"—an application of the DCF income method—may be an appropriate valuation tool. *See., e.g., Crimi*, 105 T.C.M. (CCH) at 1345–46; *Glick v. Commissioner*, T.C. Memo. 1997-65, 73 T.C.M. (CCH) 1925, 1929–30. The subdivision method values undeveloped land by treating the property as if it were subdivided and developed, estimating the costs of development and future sale proceeds, and then discounting the expected net cashflows to present value. *See Glick*, 73 T.C.M. (CCH) at 1929. Because the HBU of the Subject Property is a speculative hold for future development, the subdivision method would not generate reliable results here, given the numerous and highly uncertain assumptions necessarily entailed in implementing it. We thus give no weight to Mr. Driggers' backup DCF analysis. *See supra* note 10.

[*68] acres to 856.6 acres. These tracts had a mix of zoning designations and included agricultural properties.[27]

Of the seven transactions Mr. Driggers selected, we find the most persuasive to be the three sales that occurred in Greene County, all involving parcels slightly smaller than the 355-acre Subject Property:

- Comparable #3 was a 288-acre tract near Greensboro that sold for $8,091 per acre in October 2013. The property is located across from the Del E. Webb community and has waterfront acreage on Lake Oconee. It was zoned partially for agricultural use and partially for residential use, with 220 feet of lake and road frontage. After being on the market for three years, it was purchased by a developer who planned to develop it into a residential subdivision to be called "The Farm at Lake Oconee."

- Comparable #6 was a 248.9-acre tract in Greene County that sold for $14,507 per acre in November 2012. Zoned mainly for agricultural use, it had 4,570 feet of frontage along the Oconee River that would be attractive for residential development. A bank acquired the property by foreclosure in December 2011 and sold it to a developer in November 2012.

- Comparable #7 was a 194.4-acre tract in Greene County that sold for $10,286 per acre in February 2012. This tract, located roughly 10 miles from the Subject Property, had about 9,500 feet of frontage on Lake Oconee. The purchaser was a developer who subdivided the parcel into homesites for a community to be called "Oconee Landing." A small number of waterfront lots initially sold in the $200,000 range, while lots lacking lake frontage sold

---

[27] Petitioner contends that agricultural properties should not be used as comparables when considering a prospective mixed-use residential development. We disagree: Because the HBU of the Subject Property is a speculative hold for *potential future* development, well-situated agricultural properties are perfectly plausible candidates. CBRE and Weibel both used agricultural properties as comparables when preparing their appraisals of the Parent Tract in 2011 and 2014, and this seems perfectly sensible: Numerous suburban and exurban developments have been built on land formerly used for agricultural purposes. We also reject petitioner's assertion that Mr. Driggers selected comparables "in the middle of nowhere." Six of his comparables were within 40 miles of the Subject Property, and the three in or near Greensboro all had desirable waterfront acreage on Lake Oconee. The comparables he chose outside Greene County had plausible development potential, being located (1) in suburban Atlanta, (2) near I–20 or another busy Atlanta highway, (3) near state or national parks, or (4) near existing residential subdivisions.

**[\*69]** for roughly $35,000.  The first homes were built in 2013, and construction was ongoing at year-end 2015.[28]

For all seven transactions, Mr. Driggers adjusted the actual sale prices upward.  He made these adjustments to account for differences (for example) in parcel size, "conditions of sale," and access to major roadways.  He adjusted all 2012–2014 sale prices upward to account for improvement in the general economy after 2012.[29]

Mr. Driggers adjusted the prices for Comparables #5 and #6 upward by 5% to account for the fact that a bank was the seller, noting that lenders post-foreclosure often tend to be "more than typically motivated sellers."  After interviews with brokers involved in those two transactions, he concluded that a modest upward adjustment was reasonable, noting that the properties were sold reasonably quickly after being placed on the market.[30]

For the seven transactions, Mr. Driggers calculated an average sale price of $8,488 per acre, which he increased to $12,550 per acre after making upward adjustments as described above.  But he believed that emphasis should be given to the three transactions from Greene County, recognizing that "market participants presented with th[ese] data might

[28] For Comparable #7 petitioner says that Mr. Driggers should have placed more weight on the developer's subsequent sales of the subdivided lots, which fetched an average price of $33,586 per acre.  We disagree—quarter-acre lots sold by a developer at retail are not comparable to the 355-acre Subject Property.

[29] Petitioner criticizes Mr. Driggers' treatment of sale transactions from 2012–2013 as "comparable."  But as Mr. Driggers explained, few tracts comparable in size to the Subject Property were sold during 2014–2015, and he made appropriate upward adjustments to his 2012–2013 prices.  Petitioner's expert Mr. Galphin admitted at trial that it was "very difficult" to find sales of similar land; indeed, he treated two 2012 transactions as "comparable" even though they occurred in suburban Atlanta as opposed to Greene County.  Mr. Galphin's only "comparable sale" from Greene County occurred in February 2007, eight years before the valuation date.

[30] Petitioner faults Mr. Driggers for using bank sales as comparables, urging that any "distress sale, a forced sale, or one negotiated with unusual terms provided by the seller" should be discarded.  *See* Rev. Proc. 79-24, 1979-1 C.B. 565, 565.  That revenue procedure does not treat sales by banks as "distress sales."  Rather, it says that an appraiser should evaluate all "trends affecting the neighborhoods" and determine—from the purchaser, the seller, or the real estate broker involved in the sale—"whether there was any compulsion exercised by either party to the sale or if there were any motives affecting the purchase price."  *Id*. at 565–66.  Mr. Driggers spoke with the transaction participants, determined that the sales were not "distressed," and concluded that a modest upward adjustment of 5% was sufficient to account for the fact that the seller was a bank.

**[*70]** well conclude that Greene County land" had above-average desirability. As he noted, "three of [his] highest value indications after adjustments [were] from Greene County, and these [were] also among the least adjusted comparables." The average adjusted sale price for the three Greene County comparable properties, all of which were slightly smaller than the Subject Property, was $15,845. On the basis of these facts and all the sales data, Mr. Driggers determined a "before value" of $15,000 per acre for the Subject Property at year-end 2015, generating a total value of $5,327,145 for the 355.143-acre parcel.

We find no flaws in Mr. Driggers' approach, and we find his bottom line to be firmly supported, not only by the comparable property transactions he selected, but also by the historical record relating to valuation of the Parent Tract. Petitioner does not contend that the Subject Property had any unique features that made it especially valuable, and the trial established that much of the acreage in the Parent Tract was essentially fungible. Thus, prior valuations of the Parent Tract shed some light on the proper valuation of the Subject Property.

The record includes three prior appraisals of the Parent Tract, all made by professional appraisers in a commercial (as opposed to a litigation) context. In 2011 CBRE appraised the Parent Tract (then comprising 1,049 acres) at $11 million, or roughly $10,500 per acre. In June 2014 CBRE appraised the Parent Tract (then comprising 1,025 acres) at $8,075,000, or about $7,900 per acre. In August 2014 Weibel appraised a 964-acre portion of the Parent Tract at $9.64 million, or roughly $10,000 per acre. All of these were "fair market value" appraisals valuing the Parent Tract using sales of comparable vacant land, including agricultural properties.

In late 2012 the Reynoldses initiated negotiations with Phoenix Capital, which sent them a letter of intent in January 2013 valuing the Parent Tract (then consisting of 1,016 acres) at $8.3 million, or about $8,170 per acre. The Reynoldses made a counteroffer in March 2013, but they were unable to reach a deal with Phoenix Capital. Later in 2013 the Reynoldses made an offer to TPA, valuing the Parent Tract (then consisting of 1,000 acres) at $7.9 million, or about $7,900 per acre. After TPA rejected that offer, Messrs. Kelly and Denbow revised their DCF analysis, arriving at a reduced value of $6.7 million, or about $6,700 per acre. According to Mr. Denbow, $6.7 million "became the new asking price" for the Parent Tract. In September 2013 the Reynoldses

**[\*71]** offered the Parent Tract to TPA at $6,700 per acre, but TPA again rejected their offer.[31]

Although TPA was not interested in the entire Parent Tract at the prices the Reynoldses were asking, the parties did reach a deal in May 2014 on a 15.43-acre parcel, which they jointly developed as Traditions. The Reynoldses sold that parcel to the joint venture for $277,740, or $18,000 per acre. Because TPA was unrelated to the Reynoldses, this was an arm's-length price that reflected the FMV of this parcel.

Situated along Carey Station Road, the Traditions parcel was more valuable than most acreage in the Parent Tract. As Mr. Kelly's 2013 projection showed, 73% of the Parent Tract consisted of "inland" property that he determined to have a net present value of less than $2,650 per acre. It is also well established that smaller parcels (other things being equal) generally sell for higher per-acre prices than larger parcels. *See Estate of Giovacchini v. Commissioner*, T.C. Memo. 2013-27, 105 T.C.M. (CCH) 1179, 1201; *Estate of Kolczynski v. Commissioner*, T.C. Memo. 2005-217, 90 T.C.M. (CCH) 290, 294 (noting premium paid for smaller parcels). Taking those factors into account, the $18,000 per-acre price to which TPA agreed in May 2014 is consistent with the $15,000 per-acre value that Mr. Driggers determined for the entire Subject Property.

The consummation of the easement transaction in December 2015 supplies a final piece of historical evidence as to the "before value" of the Subject Property. On December 23, 2015, Oconee Investors acquired all of the class A interests in Oconee (constituting 97% of the total interests) from Carey Station LLC in exchange for $3.74 million. On that day, Oconee's only assets were the Subject Property and a receivable of $34,000, and its sole liability was an obligation to pay $35,000. Ownership of Oconee was "thus a proxy for ownership" of the Subject Property. *See Plateau Holdings, LLC v. Commissioner*, T.C. Memo.

---

[31] Petitioner contends that evidence regarding the Reynoldses' offering prices for the Parent Tract is irrelevant, noting that "a mere offer, unaccepted, to buy or sell is inadmissible to establish market value," quoting *United States v. Smith*, 355 F.2d 807, 811 (5th Cir. 1966). We are not using the offering prices to establish the FMV of the Subject Property, but merely as a "sanity check" on the FMV determination Mr. Driggers reached using comparable sales. The Reynoldses' offers to sell the Parent Tract for $7,150 and $6,050 per acre supply some evidence of what *they thought* the property was worth. The fact that Mr. Driggers determined a per-acre value of $15,000—more than double the price the Reynoldses were prepared to accept—provides some comfort that his value conclusion was reasonable.

**[\*72]** 2020-93, 119 T.C.M. (CCH) 1619, 1626. Grossing up Oconee Investors' ownership percentage to 100%, the Subject Property was thus valued at roughly $3,885,670, or $10,950 per acre. *See TOT Prop. Holdings, LLC v. Commissioner*, 1 F.4th 1354, 1368 (11th Cir. 2021) (finding that the sale price for a 98.99% interest in a partnership, whose only meaningful asset was property on which an easement was granted shortly thereafter, was representative of the "before" value of the property). Petitioner cannot plausibly dispute the arm's-length character of this transaction.[32]

In sum, the historical evidence—of which there is a great deal—consistently supports Mr. Driggers' determination that the Subject Property at year-end 2015 was worth (at most) $15,000 per acre. Correctly positing the HBU of the Subject Property as a speculative hold for future mixed-use development, he determined a "before value" of $5,327,145 for the entire 355.143-acre tract. We find that his valuation was conservative, i.e., generous to petitioner.

### 3. *Petitioner's Experts*

Messrs. Galphin and Clanton assumed the wrong HBU for the Subject Property. Having assumed an incorrect HBU, they necessarily selected their comparable property sales from the wrong universe of transactions. *See Glade Creek Partners, LLC v. Commissioner*, T.C. Memo. 2020-148, 120 T.C.M. (CCH) 285, 294 (noting that an expert's valuation "is of little relevance" where the expert adopted a different HBU from the Court's), *aff'd in part, vacated in part and remanded per curiam*, No. 21-11251, 2022 WL 3582113 (11th Cir. Aug. 22, 2022)). Even on their own terms, the comparables petitioner's experts selected are highly questionable. For both reasons, we give no weight to their determinations of the "before value."

Only one of Mr. Galphin's "comparable sales" involved land in Greene County. That sale, which occurred in February 2007, involved a

---

[32] Petitioner asserts that the Reynoldses at year-end 2015 "were distressed sellers who were incapable of engaging in a fair market value transaction." In so contending petitioner cites the foreclosure on Reynolds Plantation and the outstanding mortgage loan on the Parent Tract. But the foreclosure had occurred four years previously, and the mortgage loan ($3.25 million at December 2014) represented a relatively small fraction of the Parent Tract's value. The Reynoldses were actively engaged in a profitable real estate business during 2014–2015, as shown by their joint venture with TPA to develop Traditions. Petitioner adduced no plausible evidence to support its assertion that the Reynoldses were "distressed sellers" at year-end 2015.

**[\*73]** 17.62-acre tract that the Reynoldses (then the owners of Reynolds Plantation) sold for incorporation into the Del E. Webb residential subdivision. That transaction was not comparable for several reasons.

First and most obviously, that sale occurred in February 2007, almost nine years before the valuation date for the Subject Property. The market conditions at that time—near the top of the real estate boom that preceded the Great Recession—differed entirely from the market conditions prevailing in late 2015. Secondly, at 17.62 acres, the tract was much smaller than the Subject Property (355 acres), and smaller parcels typically sell at higher per-acre prices. *See Estate of Giovacchini*, 105 T.C.M. (CCH) at 1201; *Estate of Kolczynski*, 90 T.C.M. (CCH) at 294 (noting premium paid for smaller parcels). Finally, the 17.62-acre parcel was sold to a developer that had committed to constructing a large residential community. No similar developer was active in the Greene County real estate market in late 2015. None of Mr. Galphin's adjustments—which failed to include any adjustment for market conditions—was capable of accounting for these differences.

Mr. Galphin's other four "comparable sales" involved land in the metropolitan Atlanta statistical area. Each was within 30–40 miles of downtown Atlanta and was relatively close to a major highway intersection. Each tract was thus a plausible candidate for immediate development. The Subject Property, by contrast, was 70 miles from downtown Atlanta and was not a plausible candidate for a major residential development anytime soon.[33]

Mr. Clanton selected only one "comparable sale" of real estate in Georgia. That sale, involving a 113-acre tract in Dawson County, occurred in March 2016. This transaction has diminished comparability for several reasons: (1) the parcel was less than one-third the size of the Subject Property, (2) the parcel was located three counties distant from Greene County to the northwest, and (3) the sale occurred three months after the valuation date. The other three "comparables" Mr. Clanton selected were anything but comparable. All involved property outside Georgia. Two had lake frontage, and two were sold to developers who

---

[33] The four tracts in suburban Atlanta, ranging from 113 to 183 acres, were also significantly smaller than the Subject Property. As noted in the text, smaller tracts generally sell for higher prices per acre than larger tracts. *See Akers v. Commissioner*, 799 F.2d 243, 246 (6th Cir. 1986) (agreeing that, the closer in size a property is, the more comparable it is), *aff'g* T.C. Memo. 1984-490.

[*74] were already constructing (or about to construct) residential subdivisions in the area.

Finally, the proof of the pudding is in the eating. Mr. Galphin opined that the Subject Property was worth $19.53 million, or $55,014 per acre. Mr. Clanton opined that the Subject Property was worth $16.7 million, or $47,042 per acre. These valuations are outlandish when compared to the actual historical record. In an arm's-length sale to Oconee Investors in December 2015, Carey Station LLC (owned by the Reynoldses) valued the Subject Property at roughly $3,885,670, or $10,950 per acre. And in an arm's-length sale to the Traditions joint venture in May 2014, the Reynoldses valued a 15.43-acre parcel of the Parent Tract at $277,740, or $18,000 per acre. The Subject Property was 24 times larger than the Traditions parcel. Since smaller parcels generally sell for higher per-acre prices than larger parcels, the $18,000-per-acre price for the Traditions parcel shows that the "before values" posited by petitioner's experts are not even in the ballpark.

### D.    *Valuation of the Easement*

The parties agree that the easement should be valued by calculating the difference between the FMV of the Subject Property before and after Oconee granted the easement. We have found that the "before value" of the Subject Property was $5,327,145, as determined by Mr. Driggers. The "after value" determined by Mr. Driggers, $355,143, is lower than (and thus more advantageous to petitioner than) the "after values" determined by petitioner's experts. We will thus deem respondent to have conceded that the "after value" of the Subject Property was $355,143. The value of the conservation easement was thus $4,972,002 ($5,327,145 − $355,143 = $4,972,002).

### III.    *Penalties*

The Code imposes a penalty for "the portion of any underpayment [of tax] which is attributable to . . . [a]ny substantial valuation misstatement." § 6662(a), (b)(3). A misstatement is "substantial" if the value of the property claimed on a return is 150% or more of the correct amount. § 6662(e)(1)(A). The penalty is increased to 40% in the case of a "gross valuation misstatement." § 6662(h). A misstatement is "gross" if the value of property claimed on the return exceeds 200% of the correct amount. § 6662(h)(2)(A)(i).

The value Oconee claimed for the easement on its return was $20.67 million. We have determined that the correct value of the

[*75] easement at year-end 2015 was no greater than $4,972,002. The claimed value exceeded the correct value by 416%. The valuation misstatement was thus "gross."

Generally, an accuracy-related penalty is not imposed if the taxpayer demonstrates "reasonable cause" and shows that he "acted in good faith with respect to [the underpayment]." § 6664(c)(1). This defense may be available where a taxpayer makes a "substantial" valuation overstatement with respect to charitable contribution property. *See* § 6664(c)(3) (second sentence). But this defense is not available where the overstatement is "gross." *See* § 6664(c)(3) (first sentence). The 40% penalty thus applies to the portion of Oconee's underpayment attributable to claiming a value for the easement in excess of $4,972,002.

Respondent alternatively seeks a 20% penalty for (among other things) a substantial understatement of income tax. *See* § 6662(a), (b)(2). This penalty would apply to what might be called the "lower tranche" of the underpayment, i.e., the portion of the underpayment that was not attributable to a valuation misstatement. *See Plateau Holdings, LLC v. Commissioner* (*Plateau Holdings II*), T.C. Memo. 2021-133, 122 T.C.M. (CCH) 343, 343. The 20% penalty would apply, in other words, to the portion of the underpayment resulting from our conclusion that Oconee is not entitled to a charitable contribution deduction of $4,972,002, corresponding to the correct value of the easement. The disallowance of a charitable contribution deduction in that lesser amount stems from our determinations that petitioner failed to secure a "qualified appraisal" and that section 170(e)(1) limits its deduction to zero because it failed to prove a basis in excess of zero.

The determination of an "underpayment" within the meaning of section 6662(a) cannot be made at the partnership level because partnerships do not pay tax. *Plateau Holdings II*, 122 T.C.M. (CCH) at 343. However, we can determine at the partnership level *the applicability* of the penalty for substantial understatement of income tax. *See Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 233 (2018); *Plateau Holdings II*, 122 T.C.M. (CCH) at 343.[34]

---

[34] Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is penalizable on more than one of the grounds set forth in section 6662(b). *Sampson v. Commissioner*, T.C. Memo. 2013-212, 106 T.C.M. (CCH) 276, 278 (citing *New Phoenix Sunrise Corp. v. Commissioner*, 132 T.C. 161, 187 (2009), *aff'd*, 408 F. App'x 908 (6th Cir. 2010)). Consequently,

**[\*76]** The "reasonable cause" defense may be asserted against the 20% accuracy-related penalty.  But we conclude that Oconee has not established "reasonable cause."  We have already determined that the Reynoldses, who controlled Oconee, lacked reasonable cause for failure to secure a qualified appraisal.  *See supra* pp. 45–46.  That is because they "had knowledge of facts that would cause a reasonable person to expect the appraiser falsely to overstate the value of the donated property."  *See* Treas. Reg. § 1.170A-13(c)(5)(ii).

We hold that Oconee likewise lacked reasonable cause in connection with the disallowance of a deduction under section 170(e)(1).  Between February and June 2014, the Reynoldses sold four parcels out of the Parent Tract and derived proceeds of $1,012,415 from these sales.  They reported the profit from all four sales as ordinary income on their Federal income tax returns.  In December 2014 Carey Station LLC, owned by the Reynoldses, carved a 15.63-acre parcel out of the Parent Tract and sold it for $1,049,262.  Carey Station LLC likewise reported its profit from that sale as ordinary income on the Form 1065 it originally filed for 2014.  The Reynoldses thus knew that the Parent Tract (including the Subject Property) was treated for tax purposes as property held for sale to customers in the ordinary course of their real estate business.

Because the Subject Property was "ordinary income property," the Reynoldses and their agents were fully aware of the risk that section 170(e)(1) might apply here.  Indeed, Mr. Pollock's draft and final opinions devoted four pages to this topic.  But while Mr. Pollock described how section 170(e)(1) works, he carefully avoided providing an actual opinion on this point.  Instead, he relied on the representation prepared by the Reynoldses or their agents that "[t]he Property Owner [Oconee] does not hold any portion of the [Subject] Property for sale to customers in the ordinary course of business."  This representation was incorrect insofar as it suggested that the Subject Property was not "ordinary income property" in Oconee's hands.  Because this representation was incorrect, the opinion cannot support petitioner's position regarding the application of section 170(e)(1).  *See Neonatology Assocs.*, 115 T.C. at 99

---

we will not determine whether Oconee is liable for the 20% negligence penalty under section 6662(b)(1).  "Once a partnership-level proceeding is final, the liability of the partners, if any, may be determined in a partner-level proceeding, which may involve a computational adjustment or a notice of deficiency."  *Dynamo*, 150 T.C. at 233 (citing § 6230(a)).  We note that the disposition of this partnership-level proceeding does not preclude a partner's possible liability for negligence or his ability to raise a defense to penalties in that partner-level proceeding.  *See id.* (citing Treas. Reg. § 301.6221-1).

**[\*77]** (holding that a taxpayer asserting good faith reliance on professional advice must prove that "the taxpayer provided necessary and accurate information to the adviser").

Finally, we conclude that Oconee lacked "reasonable cause" for taking the position that its basis in the Subject Property exceeded zero. Jamie Reynolds and Reynolds Partners (controlled by Mercer Reynolds) acquired the Parent Tract in 2003. They supplied no evidence at trial to establish their acquisition cost for the Parent Tract—a fact we found surprising, given that a real estate business should be able to establish what it paid for land it owns. As we explain *supra* pp. 56–57, proper substantiation of Oconee's basis in the Subject Property would require a multistep computation including numerous downward and some upward adjustments; petitioner did not even attempt such a calculation. If petitioner had evidence to establish that there was enough basis left in the Parent Tract at year-end 2015 to give Oconee a transferred basis in excess of zero, we would have expected petitioner to present that evidence at trial. Because petitioner failed to do this, we infer that it either had no evidence or chose not to present the evidence because it was unhelpful.

In sum, petitioner offered no plausible evidence to show that Oconee had reason to believe it was entitled to a charitable contribution deduction in excess of zero or that it "exercised ordinary business care and prudence" in taking that position. *See Crimi*, 105 T.C.M. (CCH) at 1353 (citing *Boyle*, 469 U.S. 241). Petitioner has thus failed to meet its burden of establishing a "reasonable cause" defense to the 20% accuracy-related penalty. *See* Rule 142(a); *Davis v. Commissioner*, 81 T.C. 806, 820 (1983), *aff'd*, 767 F.2d 931 (9th Cir. 1985) (unpublished table decision); *Fischer v. Commissioner*, 50 T.C. 164, 177 (1968).[35]

---

[35] The Commissioner asserted in the alternative a reportable transaction understatement penalty under section 6662A. However, in *Green Valley Investors, LLC v. Commissioner*, 159 T.C. 80, 103 (2022), we that held the imposition of this penalty on conservation easement transactions was improper because IRS Notice 2017-10 was issued without the notice and comment required by the Administrative Procedure Act. *See* 5 U.S.C. § 553.

**[\*78]**  We have considered all of the parties' contentions and arguments that are not discussed herein, and we find them unnecessary to reach, without merit, or irrelevant.

To reflect the foregoing,

*Decision will be entered under Rule 155.*